# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 6, 2005 Session

## IN RE AUDREY S. & VICTORIA L.

**Appeal from the Juvenile Court for Davidson County**
**Nos. 9519-20684 & 9919-45809      Betty Adams Green, Judge**

---

**No. M2004-02758-COA-R3-PT - Filed August 25, 2005**

---

This appeal involves the termination of the parental rights of a biological mother who is serving a lengthy prison sentence. Following years of drug abuse, criminal conduct, periodic incarceration, and inconsistent attention to the needs of her two children, the mother pled guilty to charges of especially aggravated kidnaping and aggravated robbery and was sentenced to serve concurrent terms of fifteen and twelve years in prison. Following her incarceration, the fathers of both children filed petitions to terminate her parental rights. The juvenile court consolidated these petitions with the mother's petition for visitation and appointed guardians ad litem for the children. The guardians ad litem later filed a joint petition to terminate the mother's parental rights, and the fathers voluntarily dismissed their termination petitions. Following a bench trial, the juvenile court entered orders terminating the mother's parental rights to both children on three grounds. The mother has appealed. We have determined that the record contains clear and convincing evidence to support terminating the mother's parental rights on two of the three grounds relied upon by the court and to support the court's conclusion that terminating the mother's parental rights is in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. WILLIAM B. CAIN, J., filed a separate concurring opinion.

Linda M. Anderson, Nashville, Tennessee, for the appellant, Jamie F.

Jacqueline B. Dixon, Nashville, Tennessee, for the appellees, Jason L., Kelly L., and Christina B.

Susie P. McGowan, Nunnelly, Tennessee, and Jennifer L. Evans, Springfield, Tennessee, Guardians ad Litem for Audrey S. and Victoria L., respectively.

# OPINION

## I.

Jamie F.[1] was an eighteen-year-old high school student when she gave birth to her first child, Audrey S., on April 30, 1995. The child's father was Terry S., her eighteen-year-old boyfriend. Shortly after the child's birth, Jamie F. and Audrey S. moved into the home of Terry S.'s mother, Wilma S., where Terry S. was also residing.[2] This arrangement was short-lived. Jamie F. soon began stealing Wilma S.'s checks and forging her signature. Jamie F. eventually stole over $3,000 from Wilma S. and deposited the money in her own bank account. Terry S. ended his relationship with Jamie F. after he discovered what Jamie F. had been doing. Jamie F. left Wilma S.'s home, taking Audrey S. with her.

On October 4, 1995, Jamie F. was arrested and charged with two counts of felony forgery. She was released pending trial, and Audrey S. remained in her custody. Jamie F. eventually pled guilty to one count of felony forgery and was placed on probation for three years. She soon violated her probation, and she was arrested and incarcerated. Audrey S. was not yet one year old. While Jamie F. was in jail, she left Audrey S. in the care of the child's great-grandmother. When caring for Audrey S. proved to be too great a burden, Audrey S.'s great-grandmother asked Wilma S. to take custody of the child. Wilma S. agreed and brought the child to live with her.

Wilma S. filed a verified petition in the Davidson County Juvenile Court on March 21, 1996 to have Audrey S. declared a dependent and neglected child. She alleged that Jamie F.: (1) had failed to care for Audrey S. properly; (2) lacked sufficient funds to feed and clothe her daughter; (3) used illegal drugs; (4) had no place to live when she was released from jail other than a camping trailer with her alcoholic uncle; and (5) had stolen from her relatives so often that she was no longer welcome in their homes. Wilma S. also noted that Audrey S. had suffered a skull fracture of unknown origin while in Jamie F.'s custody. Accordingly, Wilma S. requested the juvenile court to award her temporary custody because Audrey S. was a dependent and neglected child.

Wilma S. feared that Jamie F. would attempt to reclaim Audrey S. when she was released from jail. Accordingly, she requested two remedies. She sought a temporary custody order allowing her to retain physical possession of the child pending a final hearing. She also sought a restraining order barring Jamie F. from removing Audrey S. from her custody. The juvenile court entered the restraining order against Jamie F. on the same day the petition was filed. The court also set a preliminary hearing on Wilma S.'s custody request for March 25, 1996.

Terry S. filed a petition to establish parentage of Audrey S. on the date set for the preliminary hearing. He conceded that he was Audrey S.'s biological father and requested exclusive legal custody. On March 28, 1996, the juvenile court entered an order declaring Terry S. to be Audrey S.'s biological father and awarding temporary custody of Audrey S. to Wilma S. The order stated that

---

[1] This court customarily identifies the parties using their initials in termination cases. We are departing from this practice in this case because of the number of parties and the similarity of their initials. Accordingly, we will identify the parties in this case using their given name and the first letter of their surname.

[2] At all times relevant to this appeal, Terry S. has lived at the home of his mother, Wilma S.

the court would not set a final adjudicatory or dispositional hearing on Wilma S.'s petition for temporary custody of Audrey S. until Jamie F. requested such a hearing. The juvenile court did not address Terry S.'s request for custody of Audrey S.

Audrey S. turned one year old on April 30, 1996. Ten days later, on May 10, 1996, Jamie F., who had been released from jail sometime during the preceding month, filed a motion to set a final hearing on Wilma S.'s petition for temporary custody. She asserted that she was responsible and drug-free, that she had obtained full-time employment, that she had secured independent means of transportation, and that she would have an apartment fit for her daughter by the time of the final hearing on the petition. Jamie F. also claimed that she was a fit and proper person to have custody of her daughter, and that it was in Audrey S.'s best interests to be with her. The juvenile court scheduled a hearing on Jamie F.'s motion to set for May 29, 1996.

At the May 29, 1996 hearing, the parties informed the juvenile court that they had reached an agreement to have the final hearing on Wilma S.'s petition for temporary custody of Audrey S. on July 15, 1996. They had also agreed that Jamie F. would be allowed to exercise visitation with Audrey S. at the home of her own father every other weekend starting June 1, 1996.[3] The juvenile court later entered an order incorporating the parties' agreement.

Sadly, Jamie F. elected not to exercise her right to visitation with Audrey S. at her father's home. Despite her protestations of being "drug-free," Jamie F. was still abusing drugs and alcohol. On June 18, 1996, Jamie F. formally retracted her request for a final hearing on Wilma S.'s petition for temporary custody by filing a mislabeled "Notice of Non-Suit." At the end of June 1996, Jamie F. was involved in a car accident while smoking marijuana, after which she was sent to the hospital and then released. She was later arrested and charged with possession of marijuana, theft of property, and possession of drug paraphernalia. She was arrested again three days later, this time on a misdemeanor charge of driving under the influence of alcohol. After she agreed to enter a drug treatment program, the criminal charges arising out of the car accident and her drinking and driving were dropped.

Over the next few months, Jamie F. was in and out of several drug treatment programs. She did not complete any of them. She also chose not to exercise visitation with Audrey S. during this time. In September 1996, Jamie F. moved in with her mother, allegedly so that she would stop using drugs. While living with her mother, she filed a motion seeking modification of the May 1996 agreed order to allow her to exercise visitation with Audrey S. at her mother's home rather than at her father's home. Wilma S. opposed the motion.

The juvenile court dismissed Jamie F.'s motion following a hearing. In its November 11, 1996, order, the juvenile court noted that Jamie F. had failed to complete several drug treatment programs in the preceding months, and that Jamie F.'s mother had her own problems which had led to the removal of her sixteen-year-old son from her home. The juvenile court found no reason to modify the agreed order of visitation entered just a few months earlier. However, out of an abundance of caution, the juvenile court directed Audrey S.'s guardian ad litem to speak with both Jamie F. and Jamie F.'s father to ensure that there was no problem with visitation occurring at Jamie

---

[3]Jamie F.'s father and Wilma S. were good friends.

F.'s father's home. The juvenile court instructed Jamie F. to complete a drug treatment program before returning to court again. Audrey S. was one-and-one-half years old when the juvenile court entered this order.

The juvenile court's November 11, 1996 order did not succeed in motivating Jamie F. to turn her life around and become a suitable parent for Audrey S. Instead, for the next twenty-two months, Jamie F. vanished entirely from Audrey S.'s life. The child turned two and then three without ever once seeing or hearing from her mother. Jamie F. made no attempt to visit or even communicate with Audrey S., and there is no evidence in the record that she furnished any financial support for Audrey S. during that time. Fortunately for Audrey S., Wilma S. and Terry S. were willing and able to provide her with a healthy, loving home, and they allowed her to visit regularly with her maternal grandfather and great-grandmother.

In approximately April 1998, Jamie F. met a man named Justin L. while standing in line at a telephone booth. They exchanged telephone numbers, and Jamie F. invited Justin L. to come over to her house that night. Justin L. obliged, and the two began a sexual relationship that lasted for about one month. Jamie F. became pregnant as a result of this liaison, but the relationship ended before Jamie F. realized she was pregnant. When Jamie F. informed Justin L. of the pregnancy, he denied being the father of the child.

In September 1998, Jamie F. filed a petition in the juvenile court relating to visitation with Audrey S.[4] Following a hearing, the juvenile court entered an order on September 21, 1998 finding that although Jamie F. had previously been ordered to complete a drug rehabilitation program before returning to court, she had presented no proof or documentation that she had done so. The juvenile court reappointed Audrey S.'s guardian ad litem to determine if the visitation arrangement in the May 1996 agreed order needed to be changed, ordered Jamie F. to pay $100 per week in child support for Audrey S., directed that Jamie F. be referred to a drug rehabilitation program, and ordered Jamie F. to undergo random urine screens for drugs.

Four months later, on January 20, 1999, Jamie F. gave birth to her second child, a daughter named Victoria L. On January 28, 1999, Jamie F. filed a pro se petition in the Davidson County Juvenile Court seeking to establish Justin L.'s paternity of Victoria L. Following a hearing, the juvenile court entered an April 4, 1999 order declaring Justin L. to be the father of Victoria L. The juvenile court granted custody of Victoria L. to Jamie F., ordered Justin L. to pay child support of $51.92 per week, and provided that Justin L. would have reasonable visitation with Victoria L.[5]

Meanwhile, Jamie F. was actively involved in litigation against Terry S. Both she and Terry S. filed petitions seeking full custody of Audrey S. Jamie F. made all of the required child support payments for Audrey S. during the four months following the entry of the juvenile court's September 21, 1998 order, but she ceased paying support for Audrey S. as soon as Victoria L. was born. The

---

[4]The nature of this petition is not clear from the record. At the time, Jamie F. already had a legally enforceable right to exercise visitation with Audrey S. every other weekend at the home of her father under the May 1996 agreed order.

[5]Justin L. consistently paid child support for the next two years. Justin L. ceased making payments in 2001 after the juvenile court awarded him temporary custody of Victoria L. and terminated his child support obligation.

juvenile court held a hearing on the custody petitions on April 30, 1999, Audrey S.'s fourth birthday. The parties and Audrey S.'s guardian ad litem informed the court that they had reached an agreement on custody and visitation. Thus, on May 5, 1999, the juvenile court entered an agreed order awarding Terry S. exclusive custody of Audrey S. and granting Jamie F. supervised visitation with Audrey S. at Jamie F.'s home for three hours every Sunday. The juvenile court expressly reserved the issue of child support for a later date.

The birth of her second child did not transform Jamie F. into a fit parent. By August 1999, she had been evicted from the apartment where she was living with Victoria L. and was about to be sent back to jail.[6] She asked Justin L. whether Victoria L. could live with him for a while, but Justin L. did not think that he could take over as Victoria L.'s primary caregiver at the time because his job often required him to travel during the week. Justin L.'s mother, Christina B., offered to care for Victoria L. while Jamie F. was incarcerated. In August 1999, when Victoria L. was only six months old, she went to live with Christina B. in the Clarksville area.

Jamie F. was released from jail after approximately thirty days. She went to Christina B.'s home to reclaim Victoria L., but she had no place to live and no means of support. Concerned about Victoria L.'s welfare, Christina B. offered to continue keeping Victoria L. until Jamie F. could find a job and get set up to care for Victoria L. Victoria L. remained with her paternal grandmother for the next three-and-one-half months. During this time, Jamie F. visited Victoria L. on occasion, but she allowed weeks at a time to pass without visiting or even calling Christina B. to check on Victoria L. Far from paying Christina B. to help support Victoria L., Jamie F. was instead receiving substantial financial assistance from Christina B. Not only did Christina B. pay all of the costs of caring for Victoria L., she also paid to have Jamie F.'s car repaired, gave Jamie F. money for gas, and occasionally paid Jamie F.'s rent at the Nashville motel where she was living.

By December 1999, Jamie F.'s life had begun to improve somewhat. She had been working some, and she had found an apartment in Nashville. After Christina B. agreed to pay the security deposit and the first and last months' rent, Jamie F. moved into the new apartment. On December 24, 1999, Victoria L. moved back in with Jamie F. A little less than a month later, Victoria L. turned one year old.

Although Victoria L. remained in Jamie F.'s custody for most of 2000, Jamie F. continued to have problems that seriously affected her ability to care for Victoria L.[7] Her driver's license was suspended in the early part of 2000, and it remained suspended for at least a year-and-one-half.[8] Jamie F. frequently drove with Victoria L. in the car in spite of the suspension of her license. Jamie F. asked Christina B. to keep Victoria L. for a month in June 2000 and again for six weeks in August and September 2000. Christina B. and members of her family also kept Victoria L. every weekend in 2000. By the end of 2000, Jamie F. had experienced a self-described "nervous breakdown."

---

[6] The record is unclear regarding the basis for Jamie F.'s 1999 incarceration.

[7] It is unclear from the record what, if any, involvement Jamie F. had in Audrey S.'s life during 2000.

[8] There is evidence in the record suggesting that Jamie F.'s driver's license may have actually been revoked rather than merely suspended.

The following year marked a period of precipitous decline for Jamie F. Her problems first came to a head in March 2001. During this month, Jamie F. was involved in an automobile accident while driving on a suspended license, and she was evicted for a second time from the apartment where she was living with Victoria L. In addition, she had once again violated the terms of her probation and was facing the prospect of returning to jail. On Jamie F.'s request, Justin L. agreed to keep Victoria L. temporarily at his home in the Clarksville area.

By this point, Justin L. had become seriously concerned about Jamie F.'s ability to care for Victoria L. On March 30, 2001, he filed a petition in the Davidson County Juvenile Court seeking a change of custody. The petition described some of the recent events in Jamie F.'s life, argued that they amounted to a material change in circumstances, and asserted that it would be in Victoria L.'s best interests if Justin L. were granted full custody. Justin L. requested temporary custody pending the final hearing on his petition and a restraining order to prevent Jamie F. from removing Victoria L. from his custody. The juvenile court granted the restraining order the day the petition was filed and set a show cause hearing for April 5, 2001.

In spite of the restraining order, Jamie F. asked Justin L. if she could pick up Victoria L. for a visit on April 2, 2001. Inexplicably, Justin L. allowed her to do so. After retrieving two-year-old Victoria L. from Justin L., Jamie F. drove directly to her church where a minister counseled her that she needed to turn herself in to the police for the probation violation. Jamie F. agreed to turn herself in, and the police were called to the church. Two ministers from the church went to Justin L.'s workplace, informed him of the situation, and asked him to pick up Victoria L. Once Justin L. arrived, the police arrested Jamie F. Victoria L. watched as the police handcuffed Jamie F. and took her away.

The show cause hearing proceeded as scheduled on April 5, 2001. Jamie F. was not present at the hearing. On April 9, 2001, the juvenile court entered an order continuing Justin L.'s temporary custody of Victoria L. and the restraining order against Jamie F. The juvenile court also ordered that Jamie F. be allowed reasonable supervised visitation with Victoria L. and temporarily suspended Justin L.'s child support obligation.

Jamie F. spent forty days in jail for the probation violation. Her brother was allowed to bring Victoria L. to the jail for visitation during this time. Following her release in mid-May 2001, Jamie F. lived with her mother in Byrdstown, Tennessee. Although she found employment, she did not send any money to Justin L. to support Victoria L. On May 25, 2001, the juvenile court entered an order terminating Justin L.'s child support obligation because he had custody of Victoria L. The juvenile court also determined that Justin L. was not in arrears on any of his court-ordered child support payments for the two years before he gained temporary custody of Victoria L.

Less than one month later, Jamie F. filed a petition in the juvenile court seeking emergency removal of Victoria L. from Justin L.'s home and requesting temporary custody of Victoria L. Following a hearing, the juvenile court entered a July 3, 2001 order denying Jamie F.'s request for emergency removal. The juvenile court continued Justin L.'s temporary custody of Victoria L., ordered Jamie F. to pay child support of $37.15 per week, and awarded Jamie F. weekly visitation with Victoria L. The order provided that Jamie F. would exercise visitation by picking up Victoria L. every Tuesday at 8:00 a.m. from daycare and returning her to daycare by 5:00 p.m. The juvenile

court ordered both Jamie F. and Justin L. to undergo drug screens and directed CASA[9] to perform a home study of both parents to assist the court in determining the proper custody and visitation arrangements for Victoria L.

During July and August 2001, Jamie F. exercised some visitation with Victoria L.[10] However, the visitation did not proceed as contemplated by the juvenile court's July 3, 2001 order. Justin L. and members of his family would drive to meet Jamie F., leave Victoria L. in her care, and then drive to meet Jamie F. when she returned Victoria L. Jamie F. was often hours late for these meetings, and on at least one occasion, she did not have a car seat for Victoria L. when she came to pick her up. Jamie F. did not pay any of the child support required by the juvenile court's July 3, 2001 order during this time even though she was gainfully employed.

Jamie F. moved back to Nashville and found a job in August 2001. She lived in a hotel for a month or so before moving into a duplex with a friend. The juvenile court held a final hearing on Justin L.'s petition for a change of custody on September 14, 2001. At the hearing, Jamie F. claimed that she visited Victoria L. once a week, talked to her every day, and had been paying some child support. However, Jamie F. acknowledged that she had no proof that she had made any child support payments, and she admitted that she had not maintained stable living arrangements in the years since Victoria L. was born. When asked about her relationship with her older daughter, Jamie F. at first claimed that she saw Audrey S. approximately once a week. However, on further questioning, she conceded that it had been about a month since she had seen Audrey S.

Justin L. and Christina B. also testified at the hearing. The juvenile court asked Christina B., who had served as the primary caregiver for Victoria L. for approximately three months in 1999, over two months in 2000, and many weekends since then, if she would be willing to serve as her granddaughter's co-custodian. Christina B. agreed, and on October 17, 2001, the juvenile court entered an order designating Justin L. and Christina B. as Victoria L.'s joint custodians and directing that Victoria L. should live primarily with Justin L. The juvenile court granted Jamie F. three days of unsupervised visitation with Victoria L. every other week. Based on Jamie F.'s testimony that her current income was approximately $300 per week, the juvenile court ordered Jamie F. to pay child support of $51.92 per week for Victoria L.

On February 7, 2002 – less than five months after Jamie F. appeared in the juvenile court and insisted that she was fit to have full custody of Victoria L. – Jamie F. and a male accomplice kidnaped and robbed a woman at gunpoint. Jamie F. invited the victim, a former co-worker, to come to her home. When the victim arrived, Jamie F. led her into a back room where her accomplice accosted her with a gun. Jamie F. held the gun on the victim while her accomplice bound the victim's hands with stereo wire. After rifling through the victim's purse, taking her ATM card, and forcing her to reveal her personal identification number, Jamie F. and her accomplice stuffed the victim in the trunk of her own car. They drove to a bank to withdraw money from the victim's

---

[9]The Court Appointed Special Advocate ("CASA") is a group of specially trained community volunteers who are available to be appointed by the courts to advocate on behalf of abused and neglected children in judicial proceedings.

[10]The record is unclear whether and to what extent Jamie F. was involved in Audrey S.'s life from January to August 2001. Audrey S. turned six years old on April 30, 2001.

account, stopped to buy duct tape to bind the victims legs, and returned home. After securing the victim's legs with duct tape, they returned her to the trunk of her car and went inside.

When the victim realized that the car was parked and that she could no longer hear her assailants' voices, she triggered a latch in the trunk that dropped the back seat of the car. She escaped from the car and hobbled to a nearby street where a passing motorist stopped and cut her free before calling the police. When the police arrived, they found Jamie F. and her accomplice trying to hide in a bedroom. They were apparently unaware that their victim had escaped. The authorities arrested Jamie F. and her accomplice and interviewed them separately. According to the police, they both admitted to the kidnaping and robbery. In addition, they told the police that they had been planning to kidnap and rob another person and then roll the first victim's car into the Cumberland River with both victims tied up inside. At the time of Jamie F.'s arrest, Audrey S. was almost seven years old, and Victoria L. had just turned three.

After spending a little more than a year in jail awaiting trial, Jamie F. entered into a plea agreement with the prosecution. On February 14, 2003, she pled guilty to the charges of especially aggravated kidnaping[11] and aggravated robbery[12] in the Criminal Court for Davidson County.[13] The court sentenced Jamie F. to concurrent terms of fifteen years for the especially aggravated kidnaping conviction and twelve years for the aggravated robbery conviction. Jamie F. received credit for the year or so she had already spent in jail awaiting trial. The court noted that Jamie F. was statutorily ineligible for early release on parole with respect to her fifteen-year sentence for especially aggravated kidnaping.[14] On or about February 21, 2003, Jamie F. was transferred to the Tennessee Prison for Women to serve her sentences. Audrey S. was seven years old when Jamie F. was sentenced, and Victoria L. was four.

In the approximately five months between the September 14, 2001 final hearing on Justin L.'s petition for a change of custody and Jamie F.'s February 8, 2002 arrest and incarceration, Jamie F. made no effort to support either of her children, and she made only minimal efforts to visit them. Jamie F. was employed during this time and admitted that she was financially able to pay support for her children. In addition, Jamie F. was entitled to exercise court-ordered visitation with Audrey S. for three hours every week and with Victoria L. for three days every other week. However, in the

---

[11]A person commits the crime of especially aggravated kidnaping when he or she "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty," Tenn. Code Ann. § 39-13-302(a) (2003), and the removal or confinement is "[a]ccomplished with a deadly weapon," Tenn. Code Ann. § 39-13-305(a)(1) (2003).

[12]Aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a) (2003), when the theft is "[a]ccomplished with a deadly weapon," Tenn. Code Ann. § 39-13-402(a)(1) (2003).

[13]The theft of property charge was dismissed. The record is unclear regarding the disposition of the probation violation charge.

[14]Tenn. Code Ann. § 40-35-501(i)(2) (2003) specifies eleven particularly heinous crimes for which parole is unavailable. Especially aggravated kidnaping is included on this list. Tenn. Code Ann. § 40-35-501(i)(2)(C). A person convicted of committing any of these crimes "shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained." Tenn. Code Ann. § 40-35-501(i)(1).

five months preceding her February 8, 2002 incarceration, Jamie F. saw Audrey S. only once, on December 25, 2001. She saw Victoria L. only slightly more often, but her last visit with Victoria L. was also on December 25, 2001.[15]

On May 6, 2003, Jamie F. filed a petition in the juvenile court seeking visitation with Victoria L. Although the petition mentioned only Victoria L., the fathers of both children were present at the hearing on the petition. Terry S. and Justin L. said that they did not want their young children brought to the prison for visitation. The juvenile court stated that the only way they could prevent Jamie F. from seeing the children was to file a petition to terminate her parental rights.[16] The juvenile court took no action on Jamie F.'s petition for visitation at that time.

On July 25, 2003, Justin L. filed a petition to terminate Jamie F.'s parental rights to Victoria L., and on August 14, 2003, Terry S. followed suit and filed a petition to terminate Jamie F.'s parental rights to Audrey S.[17] On August 18, 2003, the juvenile court entered an order consolidating the fathers' termination petitions with Jamie F.'s May 6, 2003 petition for visitation for an initial hearing. At a September 2003 hearing, the juvenile court appointed counsel for Jamie F. and guardians ad litem for Audrey S. and Victoria L. On January 12, 2004, the guardians ad litem filed a joint petition to terminate Jamie F.'s parental rights, and the fathers voluntarily dismissed their termination petitions.[18]

Following the filing of the joint termination petition, Jamie F. filed a notice of appeal in the criminal court challenging her convictions for especially aggravated kidnaping and aggravated robbery, and the court appointed counsel to represent Jamie F. in her appeal. Jamie F.'s appointed

_____

[15]Victoria L. turned three on January 20, 2001. Jamie F. was scheduled to have Victoria L. that day for visitation, so Christina B. moved a party she was planning for Victoria L.'s birthday up a week. Victoria L.'s third birthday came and went without any word from, much less an appearance by, Jamie F.

[16]While the juvenile court's statement may be an accurate description of the law in some jurisdictions, *but see* James G. Dwyer, *A Taxonomy of Children's Existing Rights in State Decision Making About Their Relationships*, 11 WM. & MARY BILL RTS. J. 845, 932-33 & n.253 (2003) [hereinafter *Taxonomy of Children's Rights*], it is not an accurate description of the law in Tennessee, Tenn. Code Ann. § 36-6-301 (2001) ("After making an award of custody, the court shall, upon request of the non-custodial parent, grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship *unless* the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health.") (emphasis added).

[17]Justin L. and Terry S. filed their termination petitions prior the Tennessee Supreme Court's 2004 decision that under the current termination statutes, a biological parent does not have statutory standing to file a petition to terminate the parental rights of a child's other biological parent. *Osborn v. Marr*, 127 S.W.3d 737, 141 (Tenn. 2004). In 1971, the General Assembly enacted a statute expressly allowing the mother of a child born out of wedlock to file a petition to adopt the child, thereby effectively terminating the biological father's parental rights. Act of May 17, 1971, ch. 329, § 1, 1971 Tenn. Pub. Acts 877, 877. However, this provision was repealed in 1995 as part of a comprehensive revision of the laws governing adoption and termination of parental rights. Act of May 26, 1995, ch. 532, § 1, 1995 Tenn. Pub. Acts 951, 952. It is unclear whether this procedure remains available in adoption proceedings, albeit on a gender-neutral basis. *See* Tenn. Code Ann. § 36-1-115(a) (2001) ("Any person over eighteen (18) years of age may petition the chancery or circuit court to adopt a person"). This question was not presented in *Osborn v. Marr*, and accordingly, the Tennessee Supreme Court did not address it.

[18]The termination statutes expressly confer standing on guardians ad litem to file petitions seeking termination of parental rights. Tenn. Code Ann. § 36-1-113(b) (Supp. 2004).

counsel later filed a motion in the Court of Criminal Appeals requesting that the case be remanded to the trial court with instructions to treat Jamie F.'s notice of appeal as a timely filed petition for post-conviction relief under the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to 40-30-122 (2003). On August 13, 2004, the Court of Criminal Appeals entered an order remanding the case to the trial court. However, the Court of Criminal Appeals declined Jamie F.'s request to instruct the trial court to proceed as though the petition for post-conviction relief had been timely filed and noted that this issue must be litigated in the trial court.[19]

The termination trial was scheduled for the fall of 2004. On June 29, 2004, Justin L. committed suicide. Victoria L. was five years old. She immediately went to live with Justin L.'s brother, Jason L. Jason L. and his wife, Kelly L., already had one child, a four-month-old daughter. The couple had long been involved in caring for Victoria L. Jason L. was still living at home with Christina B. when she kept Victoria L. for three-and-one-half months in 1999 and two-and-one-half months in 2000, and Victoria L. often spent weekends at the couple's home after they were married on September 16, 2000. Following Justin L.'s death, the couple decided to adopt Victoria L. On August 24, 2004, the juvenile court granted the couple's request to be added as co-petitioners to the joint termination petition based on their status as the prospective adoptive parents of Victoria L.[20] The juvenile court also allowed Christina B. to join the suit as a co-petitioner based on her status as Victoria L.'s legal co-custodian.

On September 24, 2004, the juvenile court held a day-long bench trial on the joint termination petition and Jamie F.'s petition for visitation. Jamie F. testified at length. She confirmed most of the charges leveled against her in the joint termination petition. She acknowledged her repeated incarcerations and run-ins with the law, her extensive history of drug abuse, and her chronic failure to support her children financially even when she was able to do so. She also acknowledged two car accidents, multiple traffic tickets, and lengthy suspensions of her driver's license. She conceded that she had been evicted twice while Victoria L. was living with her, and that she had had numerous residences of relatively short duration after her children were born. She stated that she had had two "nervous breakdowns" and suffered from severe panic attacks. The only allegation of the joint termination petition that Jamie F. consistently disputed was the charge that she had willfully failed to visit with Audrey S. and Victoria L. during the four months immediately preceding her incarceration. According to Jamie F., she visited both children "all the time" during this period. Finally, Jamie F. admitted that Audrey S. was "fine" with Terry S. and Wilma S., and that Jason L., Kelly L., and Christina B. had taken good care of Victoria L.

Jamie F. devoted much of her testimony to the alleged excuses for her actions. She blamed everyone but herself for her legal problems. For example, she maintained that her accomplice in the February 2002 kidnaping and robbery was solely responsible for those crimes, and that she pled guilty only because she had a bad lawyer and was "tricke[d]." However, on questioning, Jamie F. was forced to admit that the February 2002 crimes occurred at her home, that she was present for the crimes, and that she owned the gun used in the crimes. In addition, she refused to take responsibility

---

[19]The record on appeal in this case does not contain any indication of the outcome of the proceedings in the criminal case following remand.

[20]The termination statutes expressly confer standing on prospective adoptive parents to file petitions seeking termination of parental rights. Tenn. Code Ann. § 36-1-113(b).

for her history of chronic drug abuse and her repeated failure to take advantage of treatment programs so that she could free herself from addiction and become a fit parent for her children.

Jamie F. also attempted to excuse her consistent failure to support her children. She explained that she chose not to pay child support even when she had the ability to do so because she "felt as though they [i.e., the people taking care of her two children] had plenty of means" and "wouldn't miss my little amount of money if I didn't get to send it." Jamie F. continued, "So sometimes, or most of the time I was – I paid other things."

Jamie F. presented only one other witness – her younger brother – to testify in opposition to the termination of her parental rights. In his extremely brief testimony, he corroborated Jamie F.'s claim that she visited Victoria L. three or four times during the summer of 2001 while she was living in Byrdstown with her mother. No other member of Jamie F.'s family attended the termination trial or testified on Jamie F.'s behalf. Jamie F. acknowledged that she no longer spoke to her father or anyone on her father's side of the family, and she conceded that her mother and her two brothers had not attended a single custody or visitation hearing with her in previous years. She claimed to have a good relationship with her mother's side of the family, but she conceded on cross-examination that neither her mother nor her brothers had visited her on a regular basis during the preceding two-and-one-half years while she was incarcerated.

The remaining witnesses at the termination trial all supported the position of the guardians ad litem that Jamie F.'s parental rights should be terminated. Terry S. and Wilma S. testified primarily with respect to Audrey S., and Jason L., Kelly L., and Christina B. testified regarding Victoria L. Their testimony established that both children were happy and well-adjusted and that they were living in stable, loving homes where their physical and emotional needs were being met. In addition, they testified that they believed it was important to Audrey S. and Victoria L. to be involved in each other's lives, and they had already been allowing the sisters to visit and communicate with each other on a regular basis. Their testimony also established that with one exception,[21] neither child had asked about Jamie F. in the two-and-one-half years since her February 8, 2002 incarceration.

The testimony of these witnesses established their long-term dedication to the welfare of Audrey S. and Victoria L. and their commitment to providing for them in the future. Jason L. and Kelly L. testified to their deep love for Victoria L. and the strong relationship that was already developing between Victoria L. and their other daughter. They testified that they intended to file a petition to adopt Victoria L. as soon as Jamie F.'s parental rights were terminated. Terry S. also testified regarding his intent to provide Audrey S. with a loving, two-parent home as soon as possible. When Jamie F.'s attorney questioned the value in terminating Jamie F.'s parental rights in the absence of someone to step into Jamie F.'s place as Audrey S.'s mother, Terry S. testified that he and his girlfriend of three-and-one-half years had already discussed the matter, and that she was ready and willing to adopt Audrey S. if Jamie F.'s parental rights were terminated.

---

[21]Victoria L. had recently mentioned Jamie F. to Kelly L. before the start of school on August 9, 2004. Kelly L. was quite surprised because she had not heard Victoria L. ask about her biological mother in the preceding two-and-one-half years.

-11-

Following the conclusion of the termination trial, the juvenile court entered two thorough, well written orders on October 7, 2004 and November 11, 2004 terminating Jamie F.'s parental rights to Audrey S. and Victoria L., respectively. The juvenile court found clear and convincing evidence of the existence of three statutory grounds for termination: (1) abandonment; (2) persistence of conditions; and (3) incarceration under a sentence of ten years or more imposed when a child is under the age of eight. Tenn. Code Ann. § 36-1-113(g)(1), (3), (6). After considering the nine statutory factors listed in Tenn. Code Ann. § 36-1-113(i) and other factors raised by the evidence presented at the termination trial, the juvenile court found by clear and convincing evidence that termination of Jamie F.'s parental rights was in the best interests of Audrey S. and Victoria L. The juvenile court granted the guardians ad litem's joint termination petition and denied Jamie F.'s petition for visitation with Victoria L. Jamie F. appealed.[22]

## II.
### THE STANDARDS FOR REVIEWING TERMINATION ORDERS

A biological parent's right[23] to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions.[24] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059-60 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. *State Dep't of Children's Servs. v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*,

---

[22]The parties filed two motions in this court following the May 6, 2005 oral argument. On May 13, 2005, Jason L. and Kelly L. filed a Tenn. R. App. P. 14 motion for consideration of post-judgment facts. The motion requests that we consider their filing of a petition to adopt Victoria L. in the Chancery Court for Cheatham County on May 6, 2005. A copy of the petition is attached to the motion. The filing of this petition is a fact "capable of ready demonstration" that affects "the positions of the parties or the subject matter of the action" and is therefore properly the subject of a motion for consideration of post-judgment facts. Tenn. R. App. P. 14(a). In addition, the filing of the petition merely bolsters Jason L. and Kelly L.'s unequivocal testimony at the termination trial that they intended to adopt Victoria L. as soon as Jamie F.'s parental rights were terminated. Accordingly, we hereby grant the motion for consideration of post-judgment facts.

On May 17, 2005, Jamie F. sent a handwritten letter to the Appellate Court Clerk requesting that this court delay resolution of her appeal while she seeks post-conviction relief from her convictions for especially aggravated kidnaping and aggravated robbery. We construe Jamie F.'s letter as a motion under Tenn. R. App. P. 22. Jamie F.'s motion offers no legal basis for delaying the resolution of her appeal, and we are statutorily required to expedite appeals in termination of parental rights cases to the extent consistent with the preservation of the rights of the parties. Tenn. Code Ann. § 36-1-124(b) (2001). Accordingly, we hereby deny Jamie F.'s motion to delay the resolution of this appeal while she pursues post-conviction relief in the criminal courts.

[23]This right exists notwithstanding the marital status of the child's biological parents where a biological parent has established or is attempting to establish a relationship with the child. *Lehr v. Robertson*, 463 U.S. 248, 262, 103 S. Ct. 2985, 2993-94 (1983); *In re D.A.H.*, 142 S.W.3d 267, 274 (Tenn. 2004); *Jones v. Garrett*, 92 S.W.3d 835, 840 (Tenn. 2002); *In re Swanson*, 2 S.W.3d 180, 188 n.12 (Tenn. 1999). The right also extends to adoptive parents. *Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn. 1995).

[24]U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.

77 S.W.3d 137, 141 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 638 (Tenn. Ct. App. 2004); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination.[25] Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d at 838. Second, they must prove that terminating the parent's parental rights is in the child's best interests.[26] Tenn. Code Ann. § 36-1-113(c)(2); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 565 (1996); *In re Knott*, 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re D.D.K.*, No. M2003-01016-COA-R3-PT, 2003 WL 23093929, at *8 (Tenn. Ct. App. Dec. 30, 2003) (No Tenn. R. App. P. 11 application filed). Because the stakes are so profoundly high, Tenn. Code Ann. § 36-1-113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d at 622. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State Dep't of Children's Servs. v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003) (No Tenn. R. App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence, *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re S.M.*, 149 S.W.3d at 639; *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson*, 2 S.W.3d at 188. Accordingly, Tenn. Code Ann. § 36-1-113(k) explicitly requires courts terminating parental rights to "enter an order which makes specific findings of fact and conclusions of law" whether they have been requested to do so or not. *In re S.M.*, 149 S.W.3d at 639; *In re M.J.B.*, 140 S.W.3d at 653-54. These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn. Code Ann. § 36-1-113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d at 367; *In re K.N.R.*, No. M2003-01301-COA-R3-PT, 2003 WL 22999427, at *5 (Tenn. Ct. App. Dec. 23, 2003) (No Tenn. R. App. P. 11 application filed).

The heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1) requires us to adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must

---

[25] The statutory grounds for terminating parental rights are found in Tenn. Code Ann. § 36-1-113(g).

[26] The factors to be considered in a "best interests" analysis are found in Tenn. Code Ann. § 36-1-113(i).

review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49; *In re S.M.*, 149 S.W.3d at 640; *In re M.J.B.*, 140 S.W.3d at 654.[27]

### III.
### GROUNDS FOR TERMINATING JAMIE F.'S PARENTAL RIGHTS

Any one of the nine statutory grounds for termination of parental rights listed in Tenn. Code Ann. § 36-1-113(g) is sufficient to support an order terminating parental rights where termination is in the best interests of the child. *In re D.L.B.*, 118 S.W.3d at 367; *In re C.W.W.*, 37 S.W.3d at 473. The juvenile court relied on three of the statutory grounds in terminating Jamie F.'s parental rights: (1) abandonment; (2) persistence of conditions; and (3) long-term incarceration. Tenn. Code Ann. § 36-1-113(g)(1), (3), (6). Jamie F. argues that the record does not contain clear and convincing evidence of the existence of any of these grounds. We disagree.

### A.
### Abandonment

In 1995, the Tennessee General Assembly enacted a comprehensive revision of Tennessee's adoption statutes.[28] As part of this initiative, the General Assembly significantly altered the law governing the termination of parental rights. Prior to that time, there were statutes relating to the termination of parental rights in different parts of the code, and significant aspects of the law could be found only in court decisions. *O'Daniel v. Messier*, 905 S.W.2d 182, 186 & n.2 (Tenn. Ct. App. 1995).[29] The 1995 legislation consolidated the grounds for termination of parental rights in a single statute: Tenn. Code Ann. § 36-1-113(g). The first ground listed in the statute, and the one most frequently relied on, is abandonment. Tenn. Code Ann. § 36-1-113(g)(1); Diana L. Schmied, *A Roadmap Through Tennessee's New Adoption Statute*, 27 U. MEM. L. REV. 885, 888 (1997).

---

[27]These decisions draw a distinction between specific facts and the combined weight of these facts. Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. The Tennessee Supreme Court used this approach in *In re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court to support this conclusion. *In re Valentine*, 79 S.W.3d at 548-49; *see also Jones v. Garrett*, 92 S.W.3d at 838-39.

[28]Act of May 26, 1995, ch. 532, 1995 Tenn. Pub. Acts 951.

[29]*Cf. Taxonomy of Children's Rights*, 11 WM. & MARY BILL RTS. J. at 963 ("Adding further complexity to the law of termination of parental rights, states typically have, in addition to provisions for termination in their child protection statutes, provisions in another part of their codes – the part dealing with adoption – authorizing involuntary termination of parental rights. They do so implicitly by identifying special circumstances in which the consent of a legal parent to the adoption is not required and by stating that adoption terminates the rights of that parent.")

-14-

Prior to the 1995 legislation, Tennessee law defined abandonment in a variety of ways.[30] The 1995 legislation collected the four existing statutory definitions of abandonment and placed them together in Tenn. Code Ann. § 36-1-102(1)(A) (Supp. 2004). The General Assembly expressly disapproved the definition of abandonment developed by the courts for use in adoption proceedings.[31] In 2001, the General Assembly added a fifth definition of abandonment to Tenn. Code Ann. § 36-1-102(1)(A).[32] Thus, as currently constituted, Tenn. Code Ann. § 36-1-102(1)(A) provides five alternative definitions for abandonment as a ground for the termination of parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i)-(v). The juvenile court found that Jamie F. had abandoned Audrey S. and Victoria L. under the first and fourth statutory definitions.

### Abandonment Under Tenn. Code Ann. § 36-1-102(1)(A)(i)

Tenn. Code Ann. § 36-1-102(1)(A)(i) defines abandonment as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Jamie F. concedes that she did not visit or support Audrey S. or Victoria L. during the four-month period leading up to January 12, 2004, the date the guardians ad litem filed the joint termination petition.[33] However, she argues that the juvenile court erred in finding that she abandoned her children under the first statutory definition of abandonment because the record does not show that her failure to visit or support her children during this period was willful. We agree.

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. "Willfully" is a word of many meanings, and so each use of the word must be interpreted with reference to the statutory context in which it appears. *United States v.*

---

[30]For a discussion of the development of the concept of abandonment as a ground for termination of parental rights under Tennessee law, see *In re Swanson*, 2 S.W.3d at 183-85, and *O'Daniel v. Messier*, 905 S.W.2d at 186-87 & nn.2-4.

[31]Tenn. Code Ann. § 36-1-102(1)(G) ("[I]t shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions by any court to the contrary are hereby legislatively overruled."); *see O'Daniel v. Messier*, 905 S.W.2d at 187 & n.4.

[32]Act of June 7, 2001, ch. 388, § 4, 2001 Tenn. Pub. Acts 907, 910-11.

[33]The Tennessee Supreme Court recently held that under Tenn. Code Ann. § 36-1-102(1)(A)(i), "only a parent's conduct in the four months immediately preceding the filing of a petition *then before the court* may be used as grounds to terminate parental rights." *In re D.L.B.*, 118 S.W.3d at 366 (emphasis added).

-15-

*Sanchez-Corcino*, 85 F.3d 549, 552-53 (11th Cir. 1996); *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003) (No Tenn. R. App. P. 11 application filed); GEORGE W. PATON, A TEXTBOOK ON JURISPRUDENCE 313 n.2 (4th ed. 1972) (suggesting that use of the word should be avoided because of its ambiguities).

In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. *G.T. v. Adoption of A.E.T.*, 725 So. 2d 404, 409 (Fla. Dist. Ct. App. 1999). Nor does it require malevolence or ill will. *In re Adoption of a Minor*, 178 N.E.2d 264, 267 (Mass. 1961). Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. *In re Mazzeo*, 131 F.3d 295, 299 (2d Cir. 1997); *United States v. Phillips*, 19 F.3d 1565, 1576 (11th Cir. 1994); *In re Adoption of Earhart*, 190 N.E.2d 468, 470 (Ohio Ct. App. 1961); *Meyer v. Skyline Mobile Homes*, 589 P.2d 89, 97 (Idaho 1979). Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so.[34] *In re M.J.B.*, 140 S.W.3d at 654; *see also Shorter v. Reeves*, 32 S.W.3d 758, 760 (Ark. Ct. App. 2000); *In re B.S.R.*, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); *In re Estate of Teaschenko*, 574 A.2d 649, 652 (Pa. Super. Ct. 1990); *In re Adoption of C.C.T.*, 640 P.2d 73, 76 (Wyo. 1982). Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, *In re Adoption of Lybrand*, 946 S.W.2d 946, 950 (Ark. 1997), or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child, *In re Serre*, 665 N.E.2d 1185, 1189 (Ohio Ct. C.P. 1996); *Panter v. Ash*, 33 P.3d 1028, 1031 (Or. Ct. App. 2001).[35] The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially. *Bateman v. Futch*, 501 S.E.2d 615, 617 (Ga. Ct. App. 1998); *In re Leitch*, 732 So. 2d 632, 636 n.5 (La. Ct. App. 1999).

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. *In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004) (No Tenn. R. App. P. 11 application filed). Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's

---

[34]A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Pierce v. Bechtold*, 60 Tenn. App. 478, 487, 448 S.W.2d 425, 429 (1969).

[35]Conduct that amounts to a significant restraint or interference with a parent's efforts to support or develop a relationship with a child includes: (1) telling a man he is not the child's biological father; (2) blocking access to the child; (3) keeping the child's whereabouts unknown; (4) vigorously resisting a parent's efforts to support the child; or (5) vigorously resisting a parent's efforts to visit the child. *In re S.A.B.*, 735 So. 2d 523, 524 (Fla. Dist. Ct. App. 1999); *In re Adoption of Children by G.P.B., Jr.*, 736 A.2d 1277, 1282 (N.J. 1999); *Panter v. Ash*, 33 P.3d at 1031; *Taxonomy of Children's Rights*, 11 WM. & MARY BILL RTS. J. at 957.

actions or conduct. *See Johnson City v. Wolfe*, 103 Tenn. 277, 282, 52 S.W. 991, 992 (1899); *Absar v. Jones*, 833 S.W.2d 86, 89-90 (Tenn. Ct. App. 1992); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983); *see also In re K.L.C.*, 9 S.W.3d 768, 773 (Mo. Ct. App. 2000).

Jamie F. was incarcerated during the entire four-month period preceding the filing of the joint termination petition. It is undisputed that the children's fathers refused to allow them to be brought to the prison for visitation with Jamie F. during this time.[36] It is also clear from the record that Jamie F. had no means of paying support for her children once her crimes and resulting incarceration had deprived her of the ability to receive a weekly paycheck. Thus, the record does not support the juvenile court's implicit finding that Jamie F.'s failure to visit or support Audrey S. and Victoria L. during the four months preceding the filing of the joint termination petition was willful. Accordingly, the juvenile court erred in finding that Jamie F. abandoned Audrey S. and Victoria L. under Tenn. Code Ann. § 36-1-102(1)(A)(i).

**Abandonment Under Tenn. Code Ann. § 36-1-102(1)(A)(iv)**

The juvenile court also found that Jamie F. abandoned Audrey S. and Victoria L. under the Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s definition of abandonment:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

This definition contains two distinct tests for abandonment. These additional tests for abandonment apply only if a parent is incarcerated at or near the time of the filing of the termination petition.[37] The first test asks whether the parent "has willfully failed to visit[,] . . . support[,] or . . . make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv). This test tracks the language of the first statutory definition of abandonment but shifts the focus from the four-month period immediately preceding the filing of the termination petition to the four-month period immediately preceding the parent's incarceration. The concept of "willfulness" is the same under both provisions. Tenn. Code Ann. § 36-1-102(1)(B)-(E). The second test asks whether the parent "has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of

---

[36]In pointing out this fact, we do not mean to criticize in any way the fathers' decision not to allow Audrey S. and Victoria L. to be taken to a prison, even for visitation with their mother.

[37]Prior to the 1995 legislation, this definition of abandonment was further restricted to cases in which the child was in the custody of the Tennessee Department of Human Services or a licensed child-placing agency. Tenn. Code Ann. § 37-1-102(b)(1)(B)(i) (Supp. 1994).

the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). This test has no analog in the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period.

The General Assembly's decision to provide two additional tests for abandonment for incarcerated or recently incarcerated parents reflects, in part, the difficulties inherent in proving that a parent has willfully failed to visit or support a child for four consecutive months when the parent was incarcerated during all or part of that time. Incarceration necessarily restricts a prisoner's freedom of movement, and many prisoners have no resources with which to continue paying child support once their crimes and resulting imprisonment have forced them to forfeit their regular jobs. Thus, the parent's incarceration provides a ready-made excuse for his or her failure to visit or support the child during the four-month period made relevant by the first statutory definition of abandonment. However, the strong public interest in providing procedures for terminating the parental rights of unfit parents does not dissipate simply because a parent's irresponsible conduct has reached the level of criminal behavior and incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s first test for abandonment prevents a parent from relying on his or her own criminal behavior and resulting imprisonment as a defense to the termination of his or her parental rights by allowing the court to examine the record of visitation and support during the most recent four-month period for which the excuse of incarceration is unavailable.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be other problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *Taxonomy of Children's Rights*, 11 WM. & MARY BILL RTS. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights.[38] An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

Jamie F. challenges the juvenile court's conclusion that she met the requirements of Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s first test for abandonment. The juvenile court specifically found

---

[38]A statutory scheme that made the mere fact of incarceration a ground for the termination of parental rights, without regard to the length of confinement, the nature of the underlying offense or offenses, and the effect, if any, of the parent's criminal conduct and incarceration on the child, would raise serious constitutional questions. *Cf.* Tenn. Code Ann. § 36-1-113(g)(5) (making incarceration a ground for termination of parental rights only where the parent has been sentenced to more than two years in prison for severe child abuse committed against the child, the child's sibling or half-sibling, or any other child residing in the parent's home); Tenn. Code Ann. § 36-1-113(g)(6) (making incarceration a ground for the termination of parental rights only where the parent is confined under a sentence of ten years or more and the child was under eight years of age when the sentence was entered); Tenn. Code Ann. § 36-1-113(g)(7) (making conviction for intentional or wrongful death of child's other parent or legal guardian a ground for termination of parental rights).

that during the four-month period between October 8, 2001 and February 8, 2002, Jamie F. visited Audrey S. and Victoria L. only once or twice and paid no support for either child. On the issue of willfulness, the juvenile court rejected Jamie F.'s half-hearted claim that Terry S. had prevented her from seeing Audrey S. and found that Jamie F. was employed and able to pay support for her children during the months leading up to her incarceration.

Jamie F. disputes the juvenile court's factual findings on the basis of her own testimony at the termination trial that she visited Audrey S. and Victoria L. "all the time" during the four months immediately preceding her incarceration and that she paid "some" support for each child. This argument is meritless. The juvenile court obviously disbelieved Jamie F.'s claims of frequent pre-incarceration visitation and even occasional support payments and credited instead the contrary testimony of Terry S., Wilma S., and Christina B. We accord great weight to a trial court's decisions regarding the credibility of the witnesses who have testified before it. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G. Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). In addition, having reviewed the trial transcript in great detail, we find it unsurprising that the juvenile court found Jamie F.'s vacillating, inconsistent, and often outright false testimony to be unconvincing.

Jamie F. visited Audrey S. and Victoria L. no more than once or twice during the four months immediately preceding her incarceration. This amounts to nothing more than token visitation. In a similar vein, even if we were to credit Jamie F.'s testimony that she paid support for her children during this period, her own testimony establishes that she made only a "few" payments, and that the total amount of support she paid "wouldn't have been much." This amounts to nothing more than token support. Thus, the record on appeal contains clear and convincing evidence that Jamie F. willfully failed to visit or support her children during the four-month period immediately preceding her incarceration on February 8, 2002. Accordingly, we affirm the juvenile court's finding that Jamie F. abandoned Audrey S. and Victoria L. under Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s first test for abandonment.

Jamie F. also challenges the juvenile court's conclusion that she satisfied the requirements of Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment. The juvenile court specifically found that Jamie F. committed probation violations in 1996 and 2001, that she was incarcerated in 1996, 2001, and 2002, and that she pled guilty to an especially aggravated kidnaping and an aggravated robbery that occurred the day before her incarceration.[39] The juvenile court also found that Jamie F. had an extensive history of drug abuse and that she had failed to maintain a stable residence for any length of time following the birth of her children.

Jamie F. admitted all of these facts at the termination trial. However, she argues that these facts do not provide clear and convincing evidence that she engaged in pre-incarceration conduct which exhibited a wanton disregard for the welfare of Audrey S. and Victoria L. Jamie F.'s argument presents two issues: (1) whether the juvenile court erred in finding that Jamie F.'s probation violations, repeated incarceration, criminal behavior, drug abuse, and failure to maintain a stable residence exhibited a wanton disregard for the welfare of Audrey S. and Victoria L.; and (2)

---

[39]The record also shows that Jamie F. was also incarcerated, for unknown reasons, in August 1999.

-19-

whether the juvenile court erred in relying on conduct prior to the four-month period immediately preceding Jamie F.'s February 8, 2002 incarceration in making this finding.

The first issue is resolved by reference to our prior case law. We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child. *See, e.g.*, *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7-8 (Tenn. Ct. App. Jan. 11, 2005), *perm. app. denied* (Tenn. Mar. 21, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004) (No Tenn. R. App. P. 11 application filed); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d at 474-75. In this case, all of these elements are present. Thus, the juvenile court did not err in finding that Jamie F.'s pre-incarceration conduct displayed a wanton disregard for the welfare of Audrey S. and Victoria L.

The second issue is not so easily resolved by reference to our prior case law. In three cases, this court has stated, without analysis, that trial courts can consider only the parent's behavior in the four months immediately preceding the parent's incarceration in determining whether a parent has engaged in pre-incarceration conduct which exhibits a wanton disregard for the welfare of the child. *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005) (No Tenn. R. App. P. 11 application filed); *State Dep't of Children's Servs. v. T.L.C.*, No. E2002-00699-COA-R3-CV, 2002 WL 31324623, at *2 (Tenn. Ct. App. Oct. 14, 2002) (No Tenn. R. App. P. 11 application filed); *In re C.W.W.*, 37 S.W.3d at 474. In practice, we have not followed this rule with any consistency. In one of the cases that stated the rule, it is clear from the opinion of the court that we did not confine our inquiry to the four months immediately preceding the parent's incarceration. *In re H.A.L.*, 2005 WL 954866, at *7. In another case stating the rule, it is unclear from the court's opinion whether we actually followed it. *State Dep't of Children's Servs. v. T.L.C.*, 2002 WL 31324623, at *1-3.

There are only two cases in which it is clear that we have followed the rule announced in these cases.[40] By contrast, there are ten cases in which it is clear from the opinion of the court that we relied on parental conduct that occurred prior to the four-month period immediately preceding the parent's incarceration in deciding whether the parent's pre-incarceration conduct exhibited a wanton disregard for the welfare of the child.[41] In a few other cases, we did not state the rule, and

---

[40] *State Dep't of Children's Servs. v. F.E.B.*, No. E2001-00942-COA-R3-JV, 2003 WL 296185, at *3 (Tenn. Ct. App. Feb. 12, 2003) (No Tenn. R. App. P. 11 application filed); *In re C.W.W.*, 37 S.W.3d at 474-75.

[41] *In re H.A.L.*, 2005 WL 954866, at *7; *State Dep't of Children's Servs. v. J.C.G.*, No. E2004-02103-COA-R3-PT, 2005 WL 756245, at *3 (Tenn. Ct. App. Apr. 4, 2005) *perm. app. denied* (Tenn. June 27, 2005); *H.M.R. v. J.K.F.*, No. E2004-00497-COA-R3-PT, 2004 WL 1944138, at *4-5 (Tenn. Ct. App. Sept. 1, 2004) (No Tenn. R. App. P. 11 application filed); *In re C. LaC.*, 2004 WL 533937, at *7; *State Dep't of Children's Servs. v. J.S.*, No. M2000-03212-COA-R3-JV, 2001 WL 1285894, at *3-4 (Tenn. Ct. App. Oct. 25, 2001) (No Tenn. R. App. P. 11 application filed); *In re Davis*, No. W1999-01662-COA-R3-CV, 2001 WL 204204, at *9 (Tenn. Ct. App. Mar. 1, 2001) (No Tenn. R. App. P. 11 application filed); *G.M.C. v. A.V.I.*, No. E2000-00134-COA-R3-CV, 2000 WL 1195686, at *5-6 (Tenn. Ct. App. Aug. 23, 2000) *perm. app. denied* (Tenn. Feb. 20, 2001); *State Dep't of Children's Servs. v. Wiley*, No. 03A01-9903-JV-0091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999), *perm. app. denied* (Tenn. Apr. 24, 2000); *State Dep't of Children's Servs. v. Osborne*, No. 01A01-9810-JV-00564, 1999 WL 557543, at *6 (Tenn. Ct. App. Aug. 2, 1999) (continued...)

it is unclear from the court's opinion whether we followed it or not.[42]  In light of this discrepancy between our occasional statements and our actual practice, we cannot rely on our prior case law to resolve this issue.

The issue is one of statutory interpretation.  The responsibility for determining what a statute means rests with the courts.  *Roseman v. Roseman*, 890 S.W.2d 27, 29 (Tenn. 1994); *Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 601 (Tenn. Ct. App. 1999).  We must ascertain and then give the fullest possible effect to the General Assembly's purpose in enacting the statute as reflected in the statute's language.  *Stewart v. State*, 33 S.W.3d 785, 790-91 (Tenn. 2000); *Lavin v. Jordon*, 16 S.W.3d 362, 365 (Tenn. 2000).  In doing so, we must avoid constructions that unduly expand or restrict the statute's application.  *Watt v. Lumbermens Mut. Cas. Ins. Co.*, 62 S.W.3d 213, 218 (Tenn. 2001); *Patterson v. Tenn. Dep't of Labor & Workforce Dev.*, 60 S.W.3d 60, 64 (Tenn. 2001); *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 83 (Tenn. 2001).  Our goal is to construe a statute in a way that avoids conflict and facilitates the harmonious operation of the law.  *Frazier v. East Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 928 (Tenn. 2001); *LensCrafters, Inc. v. Sundquist*, 33 S.W.3d 772, 777 (Tenn. 2000).

Our construction of a statute is more likely to conform with the General Assembly's purpose if we approach the statute presuming that the General Assembly chose its words purposely and deliberately, *Tidwell v. Servomation-Willoughby Co.*, 483 S.W.2d 98, 100 (Tenn. 1972); *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 151 (Tenn. Ct. App. 2001), and that the words chosen by the General Assembly convey the meaning the General Assembly intended them to convey, *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d at 83; *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997).  Thus, we must construe statutes as we find them, *Jackson v. Jackson*, 186 Tenn. 337, 342, 210 S.W.2d 332, 334 (1948); *Pacific E. Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946, 954 (Tenn. Ct. App. 1995), and our search for a statute's purpose must begin with the words of the statute itself, *Blankenship v. Estate of Bain*, 5 S.W.3d 647, 651 (Tenn. 1999); *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 754 (Tenn. Ct. App. 2001).

We must give a statute's words their natural and ordinary meaning unless the context in which they are used requires otherwise.  *Frazier v. East Tenn. Baptist Hosp., Inc.*, 55 S.W.3d at 928; *Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn. 2000); *State v. Fitz*, 19 S.W.3d 213, 216 (Tenn. 2000).  Because words are known by the company they keep, *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d at 754, we should construe the words in a statute in the context of the entire statute and in light of the statute's general purpose, *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *Lyons v. Rasar*, 872 S.W.2d 895, 897 (Tenn. 1994); *Wachovia Bank of N.C., N.A. v. Johnson*, 26 S.W.3d 621, 624 (Tenn. Ct. App. 2000).  When the meaning of statutory

---

[41](...continued)
(No Tenn. R. App. P. 11 application filed); *In re Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997) (No Tenn. R. App. P. 11 application filed).

[42]*State Dep't of Children's Servs. v. J.M.F.*, 2005 WL 94465, at *8; *In re D.N.G.*, No. M2003-02810-COA-R3-PT, 2004 WL 2314534, at *2 (Tenn. Ct. App. Oct. 13, 2004) (No Tenn. R. App. P. 11 application filed); *In re C.T.S.*, 156 S.W.3d at 25; *Taylor v. Duncan*, No. M1999-01713-COA-R3-CV, 2000 WL 1038155, at *6 (Tenn. Ct. App. July 28, 2000) (No Tenn. R. App. P. 11 application filed).

language is clear, we must interpret it as written, *Kradel v. Piper Indus., Inc.*, 60 S.W.3d 744, 749 (Tenn. 2001); *ATS Southeast, Inc. v. Carrier Corp.*, 18 S.W.3d 626, 629-30 (Tenn. 2000), rather than using the tools of construction to give the statute another meaning, *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d at 83; *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000).

Statutes, however, are not always free from ambiguity. When we encounter ambiguous statutory language – language that can reasonably have more than one meaning[43] – we must look to the entire statute, the entire statutory scheme in which the statute appears, and elsewhere to ascertain the General Assembly's intent and purpose. *State v. Walls*, 62 S.W.3d 119, 121 (Tenn. 2001); *State v. McKnight*, 51 S.W.3d 559, 566 (Tenn. 2001). One of the sources that we frequently look to for guidance is the statute's legislative history. *Bowden v. Memphis Bd. of Educ.*, 29 S.W.3d 462, 465 (Tenn. 2000); *Hathaway v. First Family Fin. Servs., Inc.*, 1 S.W.3d 634, 640 (Tenn. 1999); *Reeves-Sain Med., Inc. v. BlueCross BlueShield of Tenn.*, 40 S.W.3d 503, 507 (Tenn. Ct. App. 2000). We must be cautious about consulting legislative history. *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d at 673. A statute's meaning must be grounded in its text. Thus, comments made during the General Assembly's debates cannot provide a basis for a construction that is not rooted in the statute's text. *D. Canale & Co. v. Celauro*, 765 S.W.2d 736, 738 (Tenn. 1989); *Townes v. Sunbeam Oster Co.*, 50 S.W.3d 446, 453 n.6 (Tenn. Ct. App. 2001). When a statute's text and the comments made during a legislative debate diverge, the text controls. *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d at 674.

The text of Tenn. Code Ann. § 36-1-102(1)(A)(iv) is somewhat cumbersome, but it is not ambiguous. It begins by describing the class of people to whom the statute applies:

> A parent or guardian [who] is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or [a] parent or guardian [who] has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding.

Next, the statute describes two distinct categories of parental behavior that amount to abandonment when engaged in by a person who falls within the designated class: (1) "willfu[l] fail[ure] to visit or . . . support or . . . make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration;" and (2) "conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv).

These categories have two salient features. First, each category has its own behavioral element: "willfu[l] fail[ure] to visit or . . . support or . . . make reasonable payments toward the support of the child" versus "conduct . . . which exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). Second, each category contains its own temporal element: "for four (4) consecutive months immediately preceding such parent's or guardian's incarceration" versus "prior to incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv). While the

---

[43] *LeTellier v. LeTellier*, 40 S.W.3d 490, 498 (Tenn. 2001); *Bryant v. HCA Health Servs. of N. Tenn., Inc.*, 15 S.W.3d 804, 809 (Tenn. 2000).

behavioral and temporal aspects of the two categories overlap to some degree, they are clearly structured as two independent tests for abandonment. The inclusion of the phrase "prior to incarceration" in the second category would have been superfluous if the General Assembly had intended the phrase "for four (4) consecutive months immediately preceding such parent's or guardian's incarceration" to apply to both categories of conduct. Tenn. Code Ann. § 36-1-102(1)(A)(iv). Thus, a close examination of the statutory text reveals that the limiting phrase "for four (4) consecutive months immediately preceding such parent's or guardian's incarceration" was intended to apply only to the first category of conduct. Tenn. Code Ann. § 36-1-102(1)(A)(iv).

We see no reason to depart from the plain meaning of the text. The Tennessee Supreme Court has not yet provided an authoritative interpretation of this provision, and our precedents on the issue are inconsistent. Moreover, we see no constitutional difficulty in applying the statute as it is written. If parental conduct which exhibits a wanton disregard for the welfare of a child can constitutionally form a ground for the termination of parental rights, it would appear to be of no moment whether that conduct occurred during the four months immediately preceding the parent's incarceration or at some earlier point in time. Thus, the juvenile court did not err in relying on Jamie F.'s behavior prior to the four months immediately preceding her incarceration in finding that she had engaged in pre-incarceration conduct that exhibited a wanton disregard for the welfare of her children.[44] Accordingly, we affirm the juvenile court's finding that Jamie F. abandoned Audrey S. and Victoria L. under Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment.

**B.**
**Failure to Remedy Persistent Conditions**

The juvenile court also relied on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Jamie F.'s parental rights. This ground for termination, which is commonly referred to as "persistence of conditions," applies where:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (i)      The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

---

[44]Even if we were to limit our inquiry to the four months immediately preceding Jamie F.'s incarceration on February 8, 2002, we would have no difficulty concluding that the record contains clear and convincing evidence that Jamie F. engaged in pre-incarceration conduct that exhibited a wanton disregard for the welfare of Audrey S. and Victoria L. During the four-month period between October 8, 2001 and February 8, 2002, Jamie F. committed a vicious kidnaping and robbery, she was using illegal drugs, she willfully failed to engage in more than token visitation with her children, and she willfully failed to provide her children with any monetary support.

(iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A).[45]

Jamie F. does not dispute that Audrey S. and Victoria L. were removed from her home for a period of more than six months on the basis of court orders. Jamie F. was never married to Terry S. or Justin L., and she therefore had legal custody of both children when they were born. Tenn. Code Ann. § 36-2-303 (2001); *Baskette v. Streight*, 106 Tenn. 549, 556, 62 S.W. 142, 144 (1901); *Taxonomy of Children's Rights*, 11 WM. & MARY BILL RTS. J. at 859 & n.28. The juvenile court effectively removed Audrey S. from Jamie F.'s home when it entered the March 21, 1996 restraining order and the March 28, 1996 order awarding temporary custody of Audrey S. to Wilma S. The juvenile court effectively removed Victoria L. from Jamie F.'s home when it entered the March 30, 2001 restraining order, an order the juvenile court maintained until October 17, 2001 when it changed custody of Victoria L. to Justin L. Jamie F. never regained custody of her children following the entry of these initial orders.

Jamie F. argues that these prior orders do not fall within the ambit of Tenn. Code Ann. § 36-1-113(g)(3) because they arose in the context of child custody disputes. She warns that if the orders removing Audrey S. and Victoria L. from her custody qualify as predicate orders of removal under Tenn. Code Ann. § 36-1-113(g)(3), then every custody order that results in a change in the primary residence of a child can serve as a basis for the later termination of the non-residential parent's parental rights. Jamie F. contends that such a result would be untenable, and she invites us to avoid it by carving out an exception to Tenn. Code Ann. § 36-1-113(g)(3) for court orders that arise in the context of child custody disputes.

The statutory text provides no basis for the broad categorical exception urged by Jamie F. It does, however, suggest a narrower limitation on the scope of this ground for termination of parental rights. The statute refers both to the original "conditions which led to the child's removal" and to "other conditions" which in all reasonable probability would cause a child to be subjected to "*further* abuse and neglect." Tenn. Code Ann. § 36-1-113(g)(3)(A)(i) (emphasis added). The reference to "further" abuse and neglect suggests, albeit obliquely, that the statute was intended to apply only where the prior court order of removal was based on a judicial finding of abuse or neglect. Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

The historical development of the statute also suggests that it was intended to be limited to cases in which the prior order of removal was based on a judicial finding of dependency, neglect, or abuse. The General Assembly created the ground for termination of parental rights that is presently codified at Tenn. Code Ann. § 36-1-113(g)(3) in 1977.[46] Prior to that time, Tennessee courts were statutorily authorized, and in some cases required, to remove "dependent" and "neglected" children

---

[45] There is no subsection (B) in the statute. The anomalous designation of a subsection (A) without a corresponding subsection (B) originated in the draft legislation submitted to the General Assembly in 1995 by the study commission appointed by the legislature to recommend changes to Tennessee's adoption law.

[46] Act of May 18, 1977, ch. 482, § 6, 1977 Tenn. Pub. Acts 1362, 1365-66.

from the custody of their parents.[47] The words "dependent" and "neglected" were used as terms of art, and they were statutorily defined to include cases of child abuse.[48]

However, the law did not authorize termination of parental rights based solely on a judicial finding of dependency, neglect, or abuse. Following a judicial finding of dependency, neglect, or abuse, a court could declare a child to be an "abandoned child" and terminate the parent's parental rights only if it found that the parent subsequently "made no effort to provide a suitable home" for the child, displayed "a lack of concern as to the child's welfare," and "failed to achieve a degree of personal rehabilitation as would indicate that, at some future date, [he or she] would provide a suitable home for the child." Tenn. Code Ann. § 36-102(5) (Supp. 1976).[49]

Thus, children removed from their parents' custody because they were dependent, neglected, or abused were often caught in a legal whipsaw. They could not be returned to their parents, because their parents had not improved to the point of being able to provide them with a suitable home, but they could not be adopted into stable and permanent homes either, because as long as their parents made some effort, however minimal, to improve, their parental rights could not be terminated. Neil P. Cohen, *A Critical Survey of Developments in Tennessee Family Law in 1976-77*, 45 TENN. L. REV. 427, 467-68 (1978). These children often languished for years in state custody or foster care until they simply "aged out" of the system.

The express purpose of the 1977 legislation was to "protec[t] . . . children from abuse and neglect" by "provid[ing] procedures and standards for such protection, including termination of parental rights." Act of May 18, 1977, ch. 482, pmbl., 1977 Tenn. Pub. Acts at 1362. The legislation recognized the critical role of permanence and stability in allowing a child to overcome the often devastating effects of dependency, neglect, and abuse by creating a new ground for termination of parental rights. This new ground for termination of parental rights assigned lasting significance to a judicial finding of dependency, neglect, or abuse and broadened the law's almost exclusive focus on the behavior and wishes of the parent to include consideration of the effects of prolonged state custody or foster care on the welfare of the child.

As originally enacted, this new ground for termination of parental rights provided as follows:

> The child has been removed from the custody of the parent by the court for at least one (1) year and the court finds that:
>
> (a)      the conditions which led to the removal still persist;

---

[47] Tenn. Code Ann. §§ 37-101 (1955), 37-104 (1955), 37-219 (1955), 37-229(c) (Supp. 1976), 37-230(a) (Supp. 1976).

[48] Tenn. Code Ann. § 37-202 (1955), 37-202(6)(ii), (vii) (Supp. 1976).

[49] Of course, the parents' parental rights could also be terminated on the grounds available in cases where there had been no prior judicial finding of dependency, neglect, or abuse, i.e., willful failure to visit or support the child for four consecutive months, Tenn. Code Ann. §§ 36-102(5) (Supp. 1976), 37-202(7) (Supp. 1976), failure to comply with the terms of a foster care plan, Tenn. Code Ann. § 37-1502 (Supp. 1976), or engaging in conduct that evinced a settled purpose to forego all parental duties and relinquish all parental claims to the child, *Ex parte Wolfenden*, 49 Tenn. App. 1, 5, 349 S.W.2d 713, 714 (1959).

(b)    there is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent in the near future; and

(c)    the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

Act of May 18, 1977, ch. 482, § 6, 1977 Tenn. Pub. Acts at 1365-66.  Unlike the then existing ground for termination contained in Tenn. Code Ann. § 36-102(5) (Supp. 1976), this new ground for termination focused on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them.  In addition, the new ground asked whether the child could be returned to the parent "in the near future,"Act of May 18, 1977, ch. 482, § 6, 1977 Tenn. Pub. Acts at 1365, rather than whether the child might be able to be returned "at some future date," Tenn. Code Ann. § 36-102(5) (Supp. 1976).[50]

We reject Jamie F.'s invitation to carve out a categorical exception to Tenn. Code Ann. § 36-1-113(g)(3) for prior court orders arising in the context of child custody disputes.  However, we hold, based on the statutory text and its historical development, that Tenn. Code Ann. § 36-1-113(g)(3) applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse. Accordingly, we must now determine whether the March 28, 1996 order removing Audrey S. from Jamie F.'s custody and the March 30, 2001 order removing Victoria L. from Jamie F.'s custody were based on judicial findings of dependency, neglect, or abuse.

The March 28, 1996 temporary custody order and preceding restraining order were entered in a dependency and neglect proceeding, but they were not based on a judicial finding that Audrey S. was dependent, neglected, or abused.  The statutes and rules governing procedure in the juvenile courts provide for three types of hearings in cases where a child is alleged to be dependent, neglected, or abused: (1) preliminary hearings; (2) adjudicatory hearings; and (3) dispositional hearings.  Tenn. Code Ann. §§ 37-1-117(c) (2001), 37-1-128(f) (2001), 37-1-129(a), (c)-(d) (Supp.

---

[50]Tenn. Code Ann. § 36-102(5)'s definition of an "abandoned child" for cases in which there had already been a previous judicial finding of dependency, neglect, or abuse remained virtually unchanged until the 1995 comprehensive revision of the law of adoption and termination of parental rights.  The 1995 legislation replaced the phrase "no effort" with "no reasonable efforts" and the phrase "at some future date" with "at an early date."  *Compare* Tenn. Code Ann. § 36-1-102(1)(A)(ii) (Supp. 1994) *with* Act of May 26, 1995, ch. 532, § 1, 1995 Tenn. Pub. Acts at 954 (codified at Tenn. Code Ann. § 36-1-102(1)(A)(ii) (Supp. 2004)).  As a result of these slight textual changes, there is a significant amount of overlap between the cases in which a parent's parental rights may properly be terminated based on the ground contained in Tenn. Code Ann. § 36-1-113(g)(3) and the cases in which a parent's parental rights may properly be terminated based on the ground of abandonment as defined by Tenn. Code Ann. § 36-1-102(1)(A)(ii).  The overlap appears to be inadvertent. *Taxonomy of Children's Rights*, 11 WM. & MARY BILL RTS. J. at 952 ("Legal rules governing termination of parent-child relationships today are ridiculously complicated.  Their Byzantine nature is not so much the inevitable consequence of attempting to deal with complex human realities as it is a reflection of piecemeal reactions by state legislatures to numerous successive, and sometimes inconsistent, directives from Congress (in the form of conditions attached to federal funding) and from federal courts, particularly the Supreme Court.  States generally have not stepped back to ask what aims they are trying to accomplish through statutory provisions relating to termination and how they can devise a coherent body of rules for accomplishing those aims.")

2004), 37-1-171(a) (2001); Tenn. R. Juv. P. 5(d)(3), 6(c), 16, 17(a), 18(a), 27(b), 28(a)-(c), (f), 32(a). The function of the adjudicatory hearing is to determine whether the allegations of dependency, neglect, or abuse are true. Tenn. R. Juv. P. 27(b), 28(a), (f)(1). The Tennessee Rules of Evidence apply, Tenn. R. Juv. P. 28(c), and the juvenile court's finding that a child is dependent, neglected, or abused must be based on clear and convincing evidence, Tenn. Code Ann. 37-1-129(c); Tenn. R. Juv. P. 28(f)(1)(i)-(ii). The purpose of the dispositional hearing, which follows the adjudicatory hearing, is to determine the proper placement for a child who has been found to be dependent, neglected, or abused. Tenn. Code Ann. § 37-1-130(a) (2001); Tenn. R. Juv. P. 32.

As its name implies, a preliminary hearing occurs prior to both the adjudicatory hearing and the dispositional hearing. Tenn. Code Ann. § 37-1-117(c); Tenn. R. Juv. P. 6(c), 16(a). Its function is to allow the juvenile court to decide whether the child should be removed from the parent's custody pending the adjudicatory hearing. Tenn. Code Ann. § 37-1-117(c); Tenn. R. Juv. P. 16(c). The juvenile court is allowed to consider reliable hearsay in making its decision, Tenn. R. Juv. P. 16(a), and it can order the child removed from the parent's custody based on a finding of "probable cause" that the child is a dependent, neglected, or abused child, Tenn. Code Ann. § 37-1-114(a)(2) (2001).[51]

The March 28, 1996 temporary custody order resulted from a preliminary hearing, not an adjudicatory hearing, and the restraining order was designed merely to preserve the status quo in advance of the preliminary hearing. The temporary custody order contains an implicit judicial finding of probable cause that Audrey S. was dependent, neglected, or abused. It does not contain a finding, either explicit or implicit, that Audrey S. was in fact dependent, neglected, or abused. The juvenile court never held an adjudicatory hearing on Wilma S.'s petition for temporary custody of Audrey S., and there is no other court order in the record prior to the filing of the joint termination petition that reflects a finding of dependency, neglect, or abuse with respect to Audrey S. Accordingly, the juvenile court erred in relying on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Jamie F.'s parental rights to Audrey S.

The March 30, 2001 restraining order that prevented Jamie F. from removing Victoria L. from Justin L.'s custody was entered on the basis of Justin L.'s verified petition for a change of custody. Justin L. did not claim that Victoria L. was dependent, neglected, or abused, and the petition did not refer to the statutes or rules governing dependency and neglect proceedings. Instead, Justin L. alleged that Victoria L. was currently residing with him, that Jamie F. denied him visitation with Victoria L. when the child was in her custody, that Jamie F.'s living arrangements and employment had become unstable during the preceding months, and that she had failed to care for Victoria L. properly. Justin L. argued that these facts amounted to a material change in circumstances, and that it would be in the best interests of Victoria L. if he was awarded custody of her.

---

[51]In order to remove a child from a parent's custody based on a finding of probable cause that the child is dependent, neglected, or abused, the juvenile court must also find probable cause that there is an immediate threat either of harm to the child's health or safety or of removal of the child from the court's jurisdiction, and that there is no less drastic alternative to removal of the child from the parent's custody. Tenn. Code Ann. § 37-1-114(a)(2).

The juvenile court's March 30, 2001 restraining order does not contain an explicit or implicit finding that Victoria L. was dependent, neglected, or abused. The obvious purpose of this order was to maintain the status quo pending further proceedings. The juvenile court entered several orders continuing Justin L.'s custody of Victoria L. in the months leading up the hearing on his change of custody petition, none of which were based on a judicial finding of dependency, neglect, or abuse. The juvenile court's October 17, 2001 order granting Justin L.'s petition contains no express judicial finding of dependency, neglect, or abuse, and an order changing custody of a minor child does not necessarily imply such a finding. Accordingly, the juvenile court erred in relying on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Jamie F.'s parental rights to Victoria L.

## C.
### Incarceration Under a Sentence of Ten Years or More
### Imposed When the Child Was Less Than Eight Years Old

The juvenile court also relied on Tenn. Code Ann. § 36-1-113(g)(6) in terminating Jamie F.'s parental rights. This ground applies where:

> The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

Tenn. Code Ann. § 36-1-113(g)(6). Jamie F. does not challenge the juvenile court's finding that she is confined in a correctional facility under two separate sentences of ten years or more as a result of her convictions for especially aggravated kidnaping and aggravated robbery. In addition, she concedes that both Audrey S. and Victoria L. were under eight years of age when these sentences were imposed. Nevertheless, she argues that the juvenile court erred in terminating her parental rights on this ground because she has filed a petition for post-conviction relief in the criminal courts, and her petition may ultimately be successful.

This argument is meritless. Jamie F.'s convictions and sentences for especially aggravated kidnaping and aggravated robbery are entitled to a presumption of correctness unless and until they have been set aside by a court of competent jurisdiction. Thus, we have repeatedly recognized that a court considering a petition for termination of parental rights based on Tenn. Code Ann. § 36-1-113(g)(6) need not look beyond the judgment of conviction and the sentence imposed by the criminal court in order to determine whether this ground for termination applies. *See, e.g.*, *State Dep't of Children's Servs. v. F.E.B.*, 2003 WL 296185, at *4; *M.P.P. v. D.L.K.*, No. E2001-00706-COA-R3-CV, 2002 WL 459010, at *5 (Tenn. Ct. App. Mar. 26, 2002) (No Tenn. R. App. P. 11 application filed); *In re Adoption of Copeland*, 43 S.W.3d 483, 489 (Tenn. Ct. App. 2000). If the mere possibility that a conviction might be reversed, or a sentence reduced, at some point in the future were sufficient to defeat the application of this ground for termination of parental rights, then Tenn. Code Ann. § 36-1-113(g)(6) would be a dead letter. We do not believe that the General Assembly intended this result. Jamie F. has presented no other challenge to the juvenile court's reliance on Tenn. Code Ann. § 36-1-113(g)(6) as a ground for terminating her parental rights. Accordingly, we affirm the juvenile court's finding that Jamie F.'s parental rights should be terminated on the ground contained in Tenn. Code Ann. § 36-1-113(g)(6).

# IV.
## BEST INTERESTS OF AUDREY S. AND VICTORIA L.

As explained above, the juvenile court properly found the existence of at least one statutory ground for terminating Jamie F.'s parental rights with respect to both Audrey S. and Victoria L. Accordingly, we must now decide whether the juvenile court correctly determined that terminating Jamie F.'s parental rights would be in the best interests of these children.

### A.

The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests. However, as important as these interests are, they do not dominate every phase of a termination of parental rights proceeding. The best interests of the child do not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of the grounds for termination listed in Tenn. Code Ann. § 36-1-113(g). Once a parent has been found to be unfit, the interests of the parent and the child diverge. While the parent's interests do not evaporate upon a finding of unfitness, *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394-95 (1982), the focus of the proceedings shifts to the best interests of the child.

While a finding of parental unfitness is a necessary prerequisite to the termination of parental rights, a finding of unfitness does not necessarily require that the parent's rights be terminated. *White v. Moody*, No. M2004-01295-COA-R3-PT, 2004 WL 3044909, at *5 (Tenn. Ct. App. Dec. 30, 2004), *perm. app. denied* (Mar. 21, 2005); *In re Termination of Parental Rights to Alexander V.*, 678 N.W.2d 856, 863 (Wis. 2004). Not all parental misconduct is irredeemable. Thus, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests.

The concept of the child's best interests evolved in the context of divorce proceedings and has now migrated from legal discourse into popular culture. What is best for children depends on values and norms upon which reasonable persons can differ. *White v. Moody*, 2004 WL 3044909, at *5; *Rideout v. Riendeau*, 761 A.2d 291, 296 n.5 (Me. 2000). Thus, critics of the best interests of the child standard often point out that its non-specificity leads to unpredictable and inconsistent outcomes. *Troxel v. Granville*, 530 U.S. at 101, 120 S. Ct. at 2079 (2000) (Kennedy, J., dissenting); PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION 2 & n.2 (Tentative Draft No. 3 1998); Julie E. Artis, *Judging the Best Interests of the Child: Judges' Accounts of the Tender Years Doctrine*, 38 LAW & SOC'Y REV. 769, 774-75 (2004).

However, others have pointed out that the courts' persistent reliance on the best interests of the child standard suggests that no more appealing formulation is likely to be offered and that it is not much less workable than other standards the law has adopted. 2 HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 20.4, at 495 (2d ed. 1987) [hereinafter THE

LAW OF DOMESTIC RELATIONS].[52]  Professor Clark, the author of one of the seminal domestic relations treatises, has observed that "few if any experienced judges and lawyers think that . . . [the child's best interests standard] goes very far toward deciding cases.  That can only be done by considering the facts of the individual case against the background of factors held to be relevant in earlier cases."  2 THE LAW OF DOMESTIC RELATIONS § 20.6, at 479.

In recent years, the Tennessee General Assembly, like other state legislatures, has undertaken to codify the factors that courts should consider when called upon to ascertain a child's best interests in various circumstances.  In termination of parental rights cases such as this one, the General Assembly has provided the courts with a non-exclusive list of nine factors to consider.  Tenn. Code Ann. § 36-1- 113(i).[53]  Thus, ascertaining a child's best interests in a termination proceeding is a fact-intensive inquiry[54] requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests.  *White v. Moody*, 2004 WL 3044909, at *5.

The child's best interests must be viewed from the child's, rather than the parent's, perspective.  *White v. Moody*, 2004 WL 3044909, at *5; *In re Hammett*, No. 245221, 2003 WL 22416515, at *2 (Mich. Ct. App. Oct. 23, 2003); *In re L.N., Jr.*, 690 N.W.2d 245, 247 (S.D. 2004); *In re Marriage of Pape*, 989 P.2d 1120, 1130 (Wash. 1999).  A focus on the perspective of the child is the common theme running through the list of mandatory factors specified in Tenn. Code Ann. § 36-1-113(i).  By the time the court reaches the best interests analysis, it will have already made a finding, supported by clear and convincing evidence, that the parent is unfit or poses a risk of substantial harm to the welfare of the child.  Accordingly, the exclusive focus on the perspective of the child in the best interests analysis does not contravene the parent's constitutional rights.

**B.**

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent.  The relevancy and weight to be given each factor depends on the unique facts of each case.  Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

---

[52]The courts in forty-nine states and the District of Columbia have been charged by statute to use the best interests of the child standard when it comes to custody determinations.  Naomi R. Cahn, *Reframing Child Custody Decisionmaking*, 58 OHIO ST. L.J. 1, 9-14 (1997).

[53]The Tennessee General Assembly has devised different sets of factors to guide the court's consideration of the child's best interests in other contexts.  *See, e.g.*, Tenn. Code Ann. § 36-6-106(a) (2001) (divorce and other proceedings); Tenn. Code Ann. § 36-6-108(c) (2001) (parental relocation); Tenn. Code Ann. § 36-6-307 (2001) (grandparent visitation); Tenn. Code Ann. § 36-6-404(b) (Supp. 2004) (parenting plans).

[54]In another context, we have noted that "[t]he 'best interests' analysis is broad and subjective.  It does not employ hard and fast rules and is largely fact-dependent.  The Tennessee Supreme Court has candidly noted that the 'best interests' analysis cannot provide perfect solutions to custody and visitation disputes."  *Yeager v. Yeager*, No. 01A01-9502-CV-00029, 1995 WL 422470, at *4 (Tenn. Ct. App. July 19, 1995) (No Tenn. R. App. P. 11 application filed) (citations omitted).

*White v. Moody*, 2004 WL 3044909, at *6. In this case, no delicate balancing of the statutory factors is required. As the juvenile court correctly found, all or virtually all of the statutory factors weigh, more or less heavily, in favor of terminating Jamie F.'s parental rights, and none of the statutory factors militates against termination. Accordingly, the question is whether there are non-statutory considerations that indicate that it would not be in the best interests of Audrey S. or Victoria L. to terminate Jamie F.'s parental rights.

Jamie F. relies on three non-statutory considerations in arguing that it is not in the best interests of Audrey S. and Victoria L. for her parental rights to be terminated. First, she claims that there is no one waiting to adopt Audrey S., and that termination of her parental rights would therefore leave Audrey S. with only a single parent for the rest of her life. Second, she contends that terminating her parental rights would deprive Audrey S. and Victoria L. of the opportunity to receive financial support from her following her eventual release from prison. Third, she notes that regardless of whether her parental rights are terminated, Audrey S. and Victoria L. will continue to reside with their current caretakers, and their day-to-day lives will not change in any significant respect if her parental rights are terminated.

The first consideration raises an interesting academic question regarding the availability of the statutory procedures for the involuntary termination of parental rights in the absence of any evidence that a child will be adopted if a parent's parental rights are terminated.[55] However, this case is not an appropriate one in which to address this question. At most, Tennessee law requires only that an adoption be contemplated at some point in the future.[56] At the termination trial, Jamie F.'s attorney asked Terry S. why he thought Jamie F.'s parental rights to Audrey S. should be terminated,

---

[55] *See, e.g.*, Douglas E. Cressler, *Requiring Proof Beyond a Reasonable Doubt in Parental Rights Termination Cases*, 32 U. LOUISVILLE J. FAM. L. 785, 798 (1994) (arguing that "the child's interests are not served by termination of the natural parents' rights unless a new family is available who has agreed to adopt the affected child" but recognizing that "the majority of jurisdictions do not require the state to show that an adoptive placement is available as a prerequisite to terminating parental rights"); Catherine Lombardo, Note, *Adoption Need Not Always Be "Waiting in the Wings" Before Parental Rights Can Be Terminated; Considerations and Procedures for Termination*, 12 J. JUV. L. 47, 47 (1991) ("Much debate has occurred over the question of whether an adoption must be pending before the courts may terminate parental rights."); 2 THE LAW OF DOMESTIC RELATIONS § 21.7, at 631 (noting that statutes authorizing the involuntary termination of parental rights not only facilitate adoption but also "enable the courts permanently to remove children from harmful parents or damaging environments, whether or not adoption is possible"); *see also* Gary R. Govert, *Termination of Parental Rights: Putting Love in Its Place*, 63 N.C. L. REV. 1177, 1183 n.55 (1985). *Compare In re Burns*, 379 A.2d 535, 541 (Pa. 1977) (holding that "a petition to terminate parental rights . . . may only be brought when adoption is contemplated") *and In re Moore*, 293 S.E.2d 127, 138-39 (N.C. 1982) (Carlton, J., dissenting) (arguing that termination would not advance the children's best interests because the record did not show that they were adoptable) *with In re Moore*, 293 S.E.2d at 134 (implicitly rejecting Justice Carlton's argument that adoptability is a prerequisite to termination of parental rights), *In re S.O.*, 483 N.W.2d 602, 604 (Iowa 1992) (holding that difficulty in finding an adoptive home for children with serious emotional problems is an insufficient basis for refusing to terminate parental rights), *and Iowa ex rel. Perkins v. Perkins*, 325 N.W.2d 764, 765 (Iowa Ct. App. 1982) (holding that a possibility of adoption is not a prerequisite to termination of parental rights).

[56] Tenn. Code Ann. § 36-1-113(a), (d)(3)(C)(ii), (g)(8)(A), (h)(1), (l)-(p); *see State Dep't of Children's Servs. v. D.G.B.*, No. E2001-02426-COA-R3-JV, 2002 WL 31014838, at *9 (Tenn. Ct. App. Sept. 10, 2002) (juvenile court erred in refusing to terminate parental rights based in part on finding that child was unadoptable and that termination was therefore not in the child's best interests; while the evidence showed that future placement would be difficult because of the child's physical and mental problems and relatively advanced age, it did not show that a future adoption was impossible) (No Tenn. R. App. P. 11 application filed).

and he answered that he believed that termination was in Audrey S.'s best interests. Jamie F.'s attorney followed up by asking him, "Well, is there anyone who is going to step in her place as a parent[?]" Terry S. responded as follows:

> Yes, yes, there is. My girlfriend. Been together for three and a half years. She's just started her final year of law school and she has – we have openly talked about this. . . . She knows [Audrey S.] and [Audrey S.] loves her. [Audrey S.] has been asked about people in her life, and she has omitted her mother and mentioned . . . my girlfriend. And yes, she is open and willing to adopt [Audrey S.].

The record on appeal contains no evidence contradicting this testimony.

The second consideration is based on a flawed premise. It is simply incorrect to say that the termination of Jamie F.'s parental rights will deprive Audrey S. and Victoria L. of the opportunity of receiving financial support from Jamie F. in the future. Nothing in the juvenile court's termination orders prevents Jamie F. from sending money to the caretakers of Audrey S. and Victoria L. with a request that it be used to support the children. In the unlikely event that Jason L. and Kelly L. or Terry S. refused to accept the money, Jamie F. could simply put it aside each month in a college savings account or some other investment vehicle and offer it to Audrey S. and Victoria L. once they have reached the age of majority. An order terminating parental rights prevents the state from requiring a former parent to make future payments toward the support of the child. Tenn. Code Ann. § 36-1-113(l)(1). It in no way prevents the former parent from undertaking to make such payments voluntarily.

In some cases, the child's loss of a legally enforceable right to future support from a parent is an appropriate consideration in deciding whether termination is in the child's best interests. *C.J.H. v. A.K.G.*, No. M2001-01234-COA-R3-JV, 2002 WL 1827660, at *7 (Tenn. Ct. App. Aug. 9, 2002) (No Tenn. R. App. P. 11 application filed). It does not follow that this consideration is a relevant factor in every case. In this case, it is abundantly clear from the evidence presented at the termination trial that Terry S. and Wilma S. on the one hand, and Jason L., Kelly L., and Christina B. on the other, are willing and able to support these children financially and in fact have already done so for most of the children's lives. It is also clear that refusing to terminate Jamie F.'s parental rights in the name of protecting an abstract legal right of Audrey S. and Victoria L. to receive future monetary support from Jamie F. would do nothing to advance the best interests of these children. Jamie F. does not claim that she is currently able to make support payments for the children, and she has a consistent pattern, developed over many years, of willfully refusing to support her children financially even in the face of court orders requiring her to do so. Nothing in the record suggests that this pattern would change in the future if Jamie F.'s parental rights were not terminated.

In advancing the third consideration, Jamie F. seeks to transform her lengthy incarceration from a statutory ground for terminating her parental rights into a factor that militates against termination. In essence, Jamie F. is arguing that precisely because she has disabled herself from participating in her children's day-to-day lives by engaging in criminal conduct that resulted in her incarceration, it cannot be in the best interests of Audrey S. and Victoria L. to terminate her parental rights. This argument borders on hubris. It also completely ignores the compelling need of Audrey

S. and Victoria L. for a stable and permanent home life that will no longer be subject to disruption at the whim of Jamie F.

The juvenile court correctly concluded that taken together, the statutory factors contained in Tenn. Code Ann. § 36-1-113(i) weigh heavily in favor of terminating Jamie F.'s parental rights. Jamie F. has pointed to no other consideration that would undermine this conclusion. When viewed from the perspective of Audrey S. and Victoria L., there can be no doubt that termination of Jamie F.'s parental rights is in the best interests of these children. Accordingly, we affirm the juvenile court's determination that terminating Jamie F.'s parental rights is in the best interests of Audrey S. and Victoria L.

# V.
## PARENTAL UNFITNESS AND SUBSTANTIAL HARM

Jamie F. argues that even if the juvenile court properly found the existence of one or more statutory grounds for termination of her parental rights with respect to Audrey S. and Victoria L., and even if the juvenile court correctly determined that termination of her parental rights was in the bests interests of both children, the juvenile court nevertheless erred in terminating her parental rights because it failed to make a separate and explicit finding that she is an unfit parent or poses a risk of substantial harm to the welfare of the children. According to Jamie F., every order terminating parental rights is constitutionally required to contain such a finding because of a parent's fundamental right, which is protected by both the United States and Tennessee Constitutions, to the care and custody of his or her minor children.[57]

This argument misconceives the relationship between the operation of the termination statutes and the constitutional requirement that "before a parent's rights can be terminated, there must be a showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated." *In re Swanson*, 2 S.W.3d at 188; *accord Hawk v. Hawk*, 855 S.W.2d at 577, 579, 581. This court has repeatedly recognized that the statutory grounds for termination of parental rights listed in Tenn. Code Ann. § 36-1-113(g) are all examples of parental conduct and situations that render a parent unfit or pose a risk of substantial harm to the welfare of a child. *White v. Moody*, 2004 WL 3044909, at *5; *In re C.D.C., Jr.*, No. E2003-01832-COA-R3-PT, 2004 WL 1243994, at *8 (Tenn. Ct. App. June 7, 2004) (No Tenn. R. App. P. 11 application filed); *State Dep't of Children's Servs. v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *9 (Tenn.

---

[57]At trial, Jamie F. limited her argument for a constitutional requirement of a separate finding of parental unfitness or substantial harm to cases in which termination is based on the ground contained in Tenn. Code Ann. § 36-1-113(g)(6). On appeal, she has broadened her argument to include termination based on any of the statutory grounds contained in Tenn. Code Ann. § 36-1-113(g). As a general rule, arguments not raised in the trial court will not be addressed for the first time on appeal. *Norton v. McCaskill*, 12 S.W.3d 789, 795 (Tenn. 2000); *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991). However, we are aware of no legal principle, and the parties have pointed us to none, that would logically restrict the application of Jamie F.'s constitutional argument to the particular ground for termination contained in Tenn. Code Ann. § 36-1-113(g)(6). If a separate finding of parental unfitness or substantial harm is constitutionally required in the context of terminations based on Tenn. Code Ann. § 36-1-113(g)(6), it is difficult to see why such a finding would not also be constitutionally required in the context of terminations based on all of the other grounds for termination listed in Tenn. Code Ann. § 36-1-113(g). Accordingly, we will address Jamie F.'s argument in the broader form in which it was presented on appeal even though the juvenile court did not have the opportunity to rule on this broader argument in the first instance.

Ct. App. May 30, 2002) (No Tenn. R. App. P. 11 application filed); *State Dep't of Children's Servs. v. C.S.M.*, No. E2000-02806-COA-R3-JV, 2002 WL 385870, at *6 (Tenn. Ct. App. Mar. 13, 2002), *perm. app. denied* (Tenn. Sept. 16, 2002); *Ray v. Ray*, 83 S.W.3d at 732 n.7.

In every case in which parental rights are terminated, there must be a "finding by the court by clear and convincing evidence that the grounds for termination o[f] parental or guardianship rights have been established," Tenn. Code Ann. § 36-1-113(c)(1), and this finding must be contained in a written order entered by the trial court, Tenn. Code Ann. § 36-1-113(k). Thus, as long as the juvenile court has correctly found that at least one of the statutory grounds for termination of parental rights exists, the constitutional requirement of a showing of parental unfitness or a risk of substantial harm to the welfare of a child has been satisfied. In effect, the constitutional unfit parent/substantial harm analysis is subsumed within the analysis of whether the statutory grounds for termination have been properly established. A separate finding of parental unfitness or substantial harm, in addition to a finding of the existence of at least one of the statutory grounds, would be redundant.

In reaching this conclusion, the only thing that gives us pause is the Tennessee Supreme Court's decision to grant the Tenn. R. App. P. 11 application for permission to appeal in *In re Marr*, No. M2001-02890-COA-R3-CV, 2003 WL 152640 (Tenn. Ct. App. Jan. 23, 2003), *perm. app. granted* (Tenn. May 27, 2003), *app. dismissed sub nom. Osborn v. Marr*, 127 S.W.3d 737 (Tenn. Jan. 23, 2004). In that case, a mother filed a petition to terminate the parental rights of her two-year-old child's biological father. *In re Marr*, 2003 WL 152640, at *1. The termination petition was based solely on the ground contained in Tenn. Code Ann. § 36-1-113(g)(6) (confinement in a correctional or detention facility under a sentence of ten years or more entered when the child was under eight years of age). *In re Marr*, 2003 WL 152640, at *1. Following the termination trial, the trial court found that the mother had established the elements of Tenn. Code Ann. § 36-1-113(g)(6) by clear and convincing evidence. *In re Marr*, 2003 WL 152640, at *5. However, the trial court refused to terminate the father's parental rights, because it found that the mother had not also proven that continuation of the parent-child relationship would threaten the welfare of the child, i.e., posed a risk of substantial harm to the welfare of the child. *In re Marr*, 2003 WL 152640, at *5.[58]

The mother appealed the trial court's refusal to terminate the father's parental rights. This court held, in conformity with our prior case law, that once a statutory ground for termination has been established, there is no constitutional requirement that the trial court make an additional finding of substantial harm. *In re Marr*, 2003 WL 152640, at *1, 13. We reversed the judgment of the trial court and remanded the case for a determination of whether termination of the father's parental rights was in the best interests of the child. *In re Marr*, 2003 WL 152640, at *13.

The Tennessee Supreme Court granted the father's Tenn. R. App. P. 11 application for permission to appeal to decide "whether Tennessee Code Annotated section 36-1-113(g)(6) . . . requires a showing of substantial harm to the child before a parent's rights may be terminated." *Osborn v. Marr*, 127 S.W.3d at 738. The court tacitly acknowledged that the termination statutes do not require a separate finding of substantial harm, and that the issue is whether such an additional finding is constitutionally required. *Osborn v. Marr*, 127 S.W.3d at 738-39. Ultimately, the court

---

[58]The trial court apparently did not consider whether the father's lengthy criminal sentence, or the behavior that produced it, rendered him an unfit parent.

did not reach this issue, because it concluded that the mother lacked statutory standing to file the termination petition. *Osborn v. Marr*, 127 S.W.3d at 741. As a result, the trial court did not have subject matter jurisdiction to hear the mother's termination petition. *Osborn v. Marr*, 127 S.W.3d at 741. Following its usual practice in cases where the trial court lacks subject matter jurisdiction, the court dismissed the case and vacated the judgments of both the trial court and this court. *Osborn v. Marr*, 127 S.W.3d at 741.

It is possible to interpret the Tennessee Supreme Court's granting of the father's Tenn. R. App. P. 11 application in *In re Marr* and its subsequent decision to vacate this court's opinion as an indication that the Tennessee Supreme Court disagrees with this court's conclusion that a separate and express finding of substantial harm, over and above a finding of the existence of one or more statutory grounds for termination, is not constitutionally required in every order terminating parental rights. We do not interpret the court's actions in this manner. First, the court expressly stated that it was not reaching "the merits of whether a separate showing of substantial harm to the child is constitutionally required when grounds for termination exist under Tennessee Code Annotated section 36-1-113(g)(6)." *Osborn v. Marr*, 127 S.W.3d at 741-42. Second, the court has repeatedly declined to grant Tenn. R. App. P. 11 applications in other cases in which this court has reached the same conclusion. *White v. Moody*, 2004 WL 3044909, at *5, *perm. app. denied* (Mar. 21, 2005); *State Dep't of Children's Servs. v. C.S.M.*, 2002 WL 385870, at *6, *perm. app. denied* (Tenn. Sept. 16, 2002); *Ray v. Ray*, 83 S.W.3d at 732 n.7, *perm. app. denied* (Tenn. July 15, 2002). Third, the court vacated this court's decision in conformance with its established procedure of dismissing a case and vacating the lower court opinions when it determines that the courts lack subject matter jurisdiction over the case. *Osborn v. Marr*, 127 S.W.3d at 741. Finally, much to the chagrin of many a litigant, the Tennessee Supreme Court's decision to grant a Tenn. R. App. P. 11 application for permission to appeal does not necessarily indicate that the court disagrees with the decision rendered by this court. *See, e.g.*, *Staubach Retail Servs.-Southeast, LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 523 (Tenn. 2005); *Mills v. Wong*, 155 S.W.3d 916, 925 (Tenn. 2005).

## VI.

We affirm the juvenile court's October 7, 2004 and November 11, 2004 orders terminating Jamie F.'s parental rights to Audrey S. and Victoria L. and denying Jamie F.'s petition for visitation. We tax the costs of this appeal to Jamie F. for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.