# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 24, 2012

## IN THE MATTER OF: JAI'SHAUNDRIA D.L.R.

**Appeal from the Juvenile Court for Davidson County**
**No. PT133789     Julie L. Ottman, Substitute Judge**

---

**No. M2011-02484-COA-R3-PT - Filed June 15, 2012**

---

A mother appeals the termination of her parental rights to one child. The trial court found two grounds for termination, abandonment and persistence of conditions leading to the child's removal from the mother's home. The finding of abandonment was based on the mother's incarceration at the time of the filing of the petition to terminate and because the mother engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child, as provided in Tennessee Code Annotated § 36-1-102(1)(A)(iv). The trial court also found termination was in the child's best interest due to the fact that the mother lacked a meaningful relationship with the child, that the mother failed to make adjustments to her home and lifestyle to make it safe for a child, and that the child was happy and healthy in her foster home of over two years such that removal would have a detrimental impact on the child's emotional and psychological condition. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Laura A. Stewart, Nashville, Tennessee, for the appellant, Faith R.

Robert E. Cooper, Jr., Attorney General and Reporter, and Joshua Davis Baker, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

Kelli Barr Summers, Brentwood, Tennessee, Guardian ad litem.

# OPINION

Faith R.[1] ("Mother"), who has a long history of drug use and bipolar disorder, gave birth to Jai'Shaundria outside of Vanderbilt Hospital on September 23, 2008. Both Mother and Jai'Shaundria tested positive for cocaine and "benzos" at the birth; Mother had also tested positive for cocaine during her only prenatal care appointment on August 8, 2008. The Department of Children's Services ("DCS") was immediately notified and a caseworker visited Mother in the hospital to discuss a temporary safety placement for Jai'Shaundria. Mother explained that her sister, Charity P. ("Ms. P."), also resided in Mother's home and would be assisting Mother in caring for the infant.

After further investigating Mother's history of drug use and mental health issues, DCS filed an Emergency Petition to Adjudicate Dependency/Neglect and Request for Court Ordered Services and Change of Custody in the Davidson County Juvenile Court on October 13, 2008 ("Emergency Petition #97101).[2] DCS also required Mother to enter into a Safety Agreement, which granted temporary custody over Jai'Shaudria to Ms. P. and prohibited Mother from spending time with the child unsupervised. Mother was also required to cooperate and remain in contact with DCS, complete a drug and alcohol assessment and refrain from drug use, and receive mental health treatment.

At subsequent hearings held in October and November 2008, DCS learned Ms. P. had been allowing Mother to have unsupervised visitation with the child, and that Mother was still using drugs. A hearing on Emergency Petition #97101 was held on December 17, 2008. Ms. P. assured the court she would do "whatever is necessary" to keep the child at home, and the court allowed the Safety Agreement to remain in place. The court also appointed a guardian ad litem.

Prior to the entry of an order resolving Emergency Petition #97101, the guardian ad litem visited Ms. P.'s home on May 12, 2009, and discovered the child at home alone with Mother; neither Ms. P. nor any other responsible adult was present. When Ms. P. arrived at the home, she got into an altercation with the guardian ad litem, after which Ms. P. fled the home. Ms. P. was arrested approximately one week later on unrelated burglary charges.

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2] Emergency Petition #97101 pertained to all three of Mother's minor children: Jai'Shaundria; KayAnna, then sixteen years old; and Deshawn, then fourteen years old. The petition to terminate Mother's parental rights currently on appeal pertains only to Jai'Shaundria.

The DCS Case Manager performed another home visit on June 3, 2009, and Jai'Shaundria was again found home alone with no responsible adult present. Mother refused to take a drug test, but admitted she had "smoked a blunt that was laced with cocaine" two days earlier. Dirty diapers, spoiled baby bottles, and other pieces of garbage were strewn about the home. The DCS Case Worker immediately removed Jai'Shaundria and two days later an Emergency Protective Custody Order was entered, removing the child from Ms. P.'s custody and placing her in DCS custody in a therapeutic foster home. DCS also filed a second Emergency Petition to Adjudicate Dependency/Neglect and Request for Court Ordered Services and Change of Custody ("Emergency Petition #110086"), seeking to have Jai'Shaundria declared dependent and neglected with respect to Mother and Ms. P.

On June 9, 2009, the trial court entered an "Order of Adjudication and Disposition" resolving Emergency Petition #97101 (filed October 13, 2008). Jai'Shaundria was found dependent and neglected due to Mother's drug use and repeated violations of the Safety Agreement.

At a permanency hearing on July 27, 2009, the juvenile court determined that Jai'Shaundria should remain in DCS custody. The court also ratified an initial permanency plan, which required Mother to complete a parenting assessment, participate in homemaker services, receive mental health counseling, continue outpatient drug and alcohol treatment, submit to random drug screens, and exercise supervised visitation with Jai'Shaundria eight hours per month. Although Jai'Shaundria was to temporarily remain in DCS custody, the goal of the plan was reunification with Mother. At the hearing, Mother signed the initial permanency plan as well as a copy of the criteria for the termination of parental rights. DCS arranged for Mother to begin working on the requirements in the permanency plan, and Mother initially made some progress. She completed a short-term "partial hospitalization" drug treatment program and passed her drug screens. She also took a few homemaker classes and resumed treatment for her mental health issues. However, the progress was short-lived.

On September 25, 2009, Mother was arrested on federal felony charges stemming from her alleged role in assisting in the escape of an inmate. She was taken into federal custody and held at the Robertson County jail. In jail, Mother was only permitted to interact with visitors for short periods of time through a closed circuit television screen and telephone, and she stopped receiving the services required in the permanency plan.

On April 26, 2010, Jai'Shaundria was again adjudicated dependent and neglected pursuant to Emergency Petition #110086 (filed June 5, 2009), due to Mother's drug use, Ms. P.'s "uncontrolled behavior at the time of the removal" in June 2009, and both women's repeated violations of the Safety Agreement. A revised permanency plan was ratified June 7, 2010. The revised plan was substantially similar to the first plan; however, adoption was

added as a secondary goal because Mother remained incarcerated and by this time, Jai'Shaundria had been living in the same foster home for almost a year. She was doing very well and her foster parent wanted to adopt her.

On November 10, 2010, DCS filed a petition to terminate Mother's parental rights to Jai'Shaundria.[3] The grounds listed were abandonment, substantial non-compliance with the permanency plan, and because Jai'Shaundria had been removed from the home for more than six months and the conditions leading to her removal persisted and were unlikely to be remedied (commonly referred to as "persistent conditions"), pursuant to Tennessee Code Annotated § 36-1-113(g)(1) through -113(g)(3).

The trial occurred on September 8, 2011. Mother could not physically attend the hearing because she remained in federal custody, but she participated by telephone and was represented by counsel, who was present and participated. At the conclusion of the trial, the court determined that DCS established the statutory grounds for termination of abandonment and persistent conditions, but not substantial noncompliance with the permanency plan.[4] The finding of abandonment was based on Mother's incarceration at the time of the filing of the petition to terminate and during the hearing on the petition, and because the trial court determined Mother engaged in conduct prior to incarceration that exhibited a wanton disregard for the child's welfare, as provided in Tennessee Code Annotated § 36-1-102(1)(A)(iv). Specifically, the court found that Mother's illegal drug use while pregnant and after Jai'Shaundria's birth, Mother's failure to provide Jai'Shaundria with a safe home environment and appropriate adult supervision, and Mother's consistent failure to comply with the Safety Agreement despite repeated warnings from the juvenile court and DCS, exhibited wanton disregard for Jai'Shaundria's welfare. *See id.* The court also found that termination of Mother's parental rights was in Jai'Shaundria's best interest due to the fact that she lacked a meaningful relationship with Mother, that Mother failed to make adjustments to her home and lifestyle to make it safe for Jai'Shaundria, and that removing Jai'Shaundria from her foster home of over two years, where she was happy and healthy, would have a detrimental impact on her emotional and psychological condition. The order terminating Mother's parental rights to Jai'Shaundria was entered on September 30, 2011.

After concluding that Jai'Shaundria's biological father could not be identified, DCS

---

[3]DCS also sought to terminate the parental rights of Sean M., whom Mother had previously identified as Jai'Shaundria's father. However, DNA testing proved he was not the father, and DCS subsequently non-suited the petition against him. Mother was not married at the time of Jai'Shaundria's birth, and no father was listed on the birth certificate or on the putative father registry, which was consulted within ten working days of the filing of the petition to terminate Mother's parental rights.

[4]DCS does not appeal this finding.

filed a motion to make the order a final judgment. The motion was not opposed, and the trial court entered an Order Terminating Parental Rights and Final Decree of Complete Guardianship on November 17, 2011.

Mother appeals, contending that the evidence presented at trial is insufficient to support a finding of abandonment by wanton disregard or persistent conditions.

## STANDARD OF REVIEW

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

ANALYSIS

I.

## ABANDONMENT BY WANTON DISREGARD

The termination of parental rights may be initiated as a result of a parent's abandonment of a child. Tenn. Code Ann. § 36-1-113(g)(1). "Abandonment" occurs when a parent is incarcerated "at or near the time of the filing of the termination petition," *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005), and the parent has, *inter alia*, "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv).[5] The conduct exhibiting wanton disregard may occur any time prior to the parent's incarceration. *In re Audrey S.*, 182 S.W.3d at 865. This is because, as this court has explained, a parent's incarceration is merely a "triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental conduct that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the child." *Id.* at 866.

Wanton disregard for the welfare of a child can be established by the parent's previous criminal conduct along with a history of drug abuse. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct App. 2006) (citing *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005); *State Dept. of Children's Servs. v. J.S.*, No. M2000-032120COA-R3-JV, 2001 WL 1285894, at \*3 (Tenn. Ct. App. Oct. 25, 2001); *State v. Osborne*, No. 01A01-9810-JV-

---

[5]Subsection (1)(A)(iv) provides in pertinent part:

For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
. . .

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to the incarceration that exhibits a wanton disregard for the welfare of the child . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

00564, 1999 WL 557543, at *6 (Tenn. Ct. App. Aug. 2, 1999)). In the case of *In re C.T.S.*, 156 S.W.3d 18 (Tenn. Ct. App. 2004), this court affirmed the trial court's termination of parental rights on the grounds of, *inter alia*, abandonment by wanton disregard based upon the finding that a mother's ingestion of crack cocaine while pregnant with the child "clearly exhibits a wanton disregard for the welfare of the child." *Id.* at 25-26.

In this case, Mother's abuse of illegal drugs was clearly established and uncontested at trial. Mother admitted to using drugs "off and on" since 1992. She tested positive for cocaine during one of her few pre-natal care appointments in August 2008 and both she and Jai'Shaundria tested positive for cocaine and "benzos" at Jai'Shaundria's birth in September 2008. Mother acknowledged that she understood the risks of using drugs while pregnant, but she explained that she had been under a lot of personal and family stress, and had been unable to cope. DCS attempted to enroll Mother in a drug treatment program, but Mother declined. She then failed a drug test in November 2008. DCS caseworkers attempted to drug test Mother again in June 2009, but Mother refused, stating that she had "smoked a blunt that was laced with cocaine" two days earlier. Mother is also afflicted with bi-polar disorder, which went largely untreated during these early months of Jai'Shaundria's life.

Due to Mother's drug problem and untreated mental illness, Mother was prohibited from spending time alone with Jai'Shaundria without proper adult supervision, as provided in the Safety Agreement between Mother, Ms. P., and DCS. Nevertheless, Mother was found alone with the child on October 14, 2008, less than one month after Jai'Shaundria's birth. In December 2008, the juvenile court reluctantly allowed Jai'Shaundria to remain in Ms. P.'s custody, due to Mother's and Ms. P's assurances that they understood the requirements of the Safety Agreement. However, in May 2009 and again in June 2009, DCS caseworkers found Mother at home with Jai'Shaundria with no responsible adults present, in violation of the Safety Agreement. As evidenced by her repeated failed drug tests and admissions of drug use, Mother was also actively using drugs during this time. Only after Jai'Shaundria was removed from Mother's home and placed in DCS custody did Mother begin drug treatment, mental health counseling, and homemaker services, which were all terminated when Mother was arrested. Mother never attended a parenting class, and did not complete her long-term aftercare drug treatment program.

This court acknowledges Mother has not been convicted of the federal felony charges for which she has been held in custody for over two years. However, at the trial on the termination petition, Mother testified that she placed three-way phone calls in September 2009 for a jail inmate, a person she had never met and did not know, but who was a friend of Ms. P. (Mother's sister). Ms. P. along with Ms. P.'s children and her friend were living with Mother at the time.

In sum, during the approximately twelve months between Jai'Shaundria's birth and Mother's incarceration, Mother engaged in serious criminal behavior, most prominently by abusing illegal drugs, consistently failing to comply with the DCS Safety Agreement which was in place for Jai'Shaundria's protection, and generally failing to provide a safe environment or appropriate supervision for Jai'Shaundria. Less than three months after Jai'Shaundria was placed in DCS custody and when Mother appeared to begin making progress toward addressing these issues, Mother inexplicably made three-way phone calls for a jail inmate whom she claims to not know, which resulted in her arrest and two-year incarceration while she awaits trial on federal felony charges.

This evidence clearly and convincingly establishes Mother engaged in conduct prior to her incarceration that demonstrates a wanton disregard for the welfare of her child. *See e.g., In re Audrey S.*, 182 S.W.3d at 867 ("We have repeatedly held that probation violations, repeated incarceration, *criminal behavior, substance abuse, and the failure to provide adequate* support *or supervision* for a child can, *alone or in combination*, constitute conduct that exhibits a wanton disregard for the welfare of a child.") (emphasis added); *see also In re C.T.S.*, 156 S.W.3d at 25-26. Therefore, we affirm the trial court's finding that DCS proved by clear and convincing evidence the ground of abandonment under Tenn. Code Ann. § 36-6-102(1)(A)(iv).

II.
PERSISTENCE OF CONDITIONS

Tennessee Code Annotated § 36-1-113(g)(3) specifies the essential elements for the "persistent conditions" ground for termination of parental rights. It provides that grounds for termination exist when:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) . . . , still persist;
> (B)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and
> (C)  The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into

a safe, stable and permanent home; . . .

*Id.*

Jai'Shaundria was removed from Mother's home and placed in her current foster home on June 3, 2009. She was first adjudicated dependent and neglected on June 9, 2009, pursuant to Emergency Petition #97101, and again on April 26, 2010, pursuant to Emergency Petition #110086. DCS filed the petition to terminate Mother's parental rights to Jai'Shaundria on November 10, 2010, more than one year after Jai'Shaundria was first removed from Mother's home and declared dependent and neglected and more than 6 months after Jai'Shaundria was declared dependent and neglected for the second time. Thus, DCS complied with the time requirement for the persistent conditions ground of termination. *See id.*; *see also In re Audrey S.*, 182 S.W.3d at 874 (holding that the court order removing the child from the parent's home must be based on a judicial finding of dependency, neglect, or abuse). Because this threshold requirement was met, we must now determine whether there is clear and convincing evidence supporting the requirements in Tennessee Code Annotated § 36-1-113(g)(3)(A) through (C).

First, the above discussion of Mother's conduct exhibiting wanton disregard for Jai'Shaundria's welfare is relevant to the requirements set forth in subsections (A) & (B) – that conditions persist which prevent Jai'Shaundria's safe return to Mother, and that these conditions are unlikely to be remedied at an early date so that Jai'Shaundria could return to Mother in the near future. *See id.* § 36-1-113(g)(3)(A) & (B). To briefly reiterate, prior to incarceration, Mother's long-term illegal drug use and mental health problems made it unsafe for Jai'Shaundria to be in Mother's sole care. During this time, DCS attempted to enroll Mother in drug treatment and to provide other services, but Mother did not cooperate and failed to make an adjustment to her lifestyle or circumstances. We acknowledge Mother's progress with the aid of DCS from June 2009 to September 2009; however, after these few months of progress, Mother admits to voluntarily engaging in behavior that resulted in her arrest and two-year incarceration while Jai'Shaundria remained in foster care. Jai'Shaundria's DCS Team Leader, Ms. Rachel Eriamiatoe, testified that after Mother's incarceration, the team members discussed the possibility of Mother receiving parenting classes in jail, but that to Ms. Eriamiatoe's knowledge, "[DCS] cannot send a provider to a federal holding facility to provide services." Thus, as the trial court states in its final order:

Due to Mother's incarceration, she has been unable to continue any type of additional treatment. Once the Mother is released she still must address her long term drug dependency issues, her mental health issues, as well as securing and providing a safe and stable home for the child that is free of environmental hazards.

Moreover, at the time of the hearing on the termination petition, Mother had not yet been to trial and did not know her release date. Based upon these facts, we find there are conditions in Mother's life which in all reasonable probability would cause Jai'Shaundria to be subjected to further neglect and that prevent a safe return to Mother's home in the near future. *See id.*

Finally, there is clear and convincing evidence that the continuation of the parent-child relationship between Mother and Jai'Shaundria would greatly diminish the chances of Jai'Shaundria being placed in a safe, stable, pre-adoptive home. *Id.* § 36-1-113(g)(3)(C). Since her incarceration, Mother has visited with Jai'Shaundria twice, for approximately twenty minutes each time. Jai'Shaundria was unable to hold the telephone to her ear and had to be assisted in order to accommodate the visitation restrictions. As a result, the DCS caseworker, team leader, and Jai'Shaundria's other service providers determined the visits were not meaningful enough to justify transporting her to the jail to speak to Mother through a television screen. Moreover, at the time of the hearing, Jai'Shaundria had been living with her foster parent, Marilyn C., for over two years, since Jai'Shaundria was less than 10 months old. Ms. C. works at a daycare center and brings Jai'Shaundria with her to work every day – thus, Jai'Shaundria is personally attended to by Ms. C. the majority of the time. Furthermore, Ms. C. testified that she loves and wants to adopt Jai'Shaundria, and that Jai'Shaundria refers to her as "Mommy."

For these reasons, we affirm the trial court's finding that DCS proved the "persistent conditions" ground for termination of Mother's parental rights by clear and convincing evidence, pursuant to Tennessee Code Annotated § 36-1-113(g)(3).

We have affirmed the trial court's findings on two grounds for termination of Mother's parental rights. If at least one statutory ground for termination is proven by clear and convincing evidence, a parent's rights may be terminated if it is also determined that termination of the parent's rights is in the best interests of the child. *See In re D.L.B.*, 118 S.W.3d at 367. Therefore, we shall determine whether termination of Mother's parental rights is in Jai'Shaundria's best interest.

III.

BEST INTEREST OF THE CHILD

The Tennessee General Assembly has provided a list of factors for the court to consider when conducting a best interest of the child analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known and need not be repeated here, are not exclusive or exhaustive, and other factors may be considered by the court. *See In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory

factor need apply; a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent-child relationship is in the child's best interest. *See In re M.A.R.*, 183 S.W.3d at 667. The child's best interest is to be determined from the perspective of the child rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

In this case, the evidence clearly and convincingly established that Mother failed to make an adjustment in circumstance to make her home safe for Jai'Shaundria, *see* Tenn. Code Ann. § 36-1-113(i)(1) & (7), in that Mother continued to use illegal drugs and violate the Safety Agreement and permanency plan after the first Emergency Petition was filed, and then engaged in behavior that led to her arrest after Jai'Shaundria was placed in foster care. Mother has no meaningful relationship with Jai'Shaundria, because Mother has been incarcerated since Jai'Shaundria was twelve months old, and communicating with Mother in jail proved too difficult for such a young child. *Id.* § 36-1-113(i)(4). Jai'Shaundria has spent the majority of her life in a loving home with a foster parent who wishes to adopt her, and who Jai'Shaundria began calling "mommy" on her own. To allow the child to return to Mother, which could not even be considered until Mother is released from jail and completes the necessary training and treatment to become a responsible parent which Mother has repeatedly shown she is unable to do, would subject Jai'Shaundria to more uncertainty and instability, and possibly remove her from the only home she has ever known, where she is happy, healthy, and thriving. *Id.* § 36-1-113(i)(5).

Considering these relevant factors from Jai'Shaundria's perspective, rather than Mother's, we find clear and convincing evidence that it is in Jai'Shaundria's best interest that Mother's parental rights be terminated.

### IN CONCLUSION

There is clear and convincing evidence to support the trial court's finding that two grounds to terminate Mother's parental rights exist and that termination of Mother's parental rights is in Jai'Shaundria's best interest. Therefore, we affirm the trial court's termination of Mother's parental rights and this matter is remanded with costs of appeal assessed against the Department of Children's Services due to the mother's indigence.

_____
FRANK G. CLEMENT, JR., JUDGE